SECOND DIVISION
June 29, 2010

No. 1-09-0422

| | | |
|---|---|---|
| CHAKENA JOHNSON, Individually and as | ) | Appeal from the |
| Special Administrator of the Estate of | ) | Circuit Court of |
| Renee Rayborn, Deceased, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Nos. 03 L 12259 |
| INGALLS MEMORIAL HOSPITAL, a Corporation, | ) | 06 L 11816 |
| ST. FRANCIS HOSPITAL & HEALTH CENTER, | ) | |
| a Corporation, LINCOLN MEDICAL CENTER, LTD., | ) | |
| a Corporation, and IMRE HIDVEGI, JAMES A. | ) | |
| THREATTE, and HEE HAN KIM, | ) | |
| Individually and as Agents or Employees of | ) | |
| LINCOLN MEDICAL CENTER, LTD., a Corporation, | ) | Honorable |
| | ) | Claire E. McWilliams, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Plaintiff, Chakena Johnson, individually and as special administrator of the estate of her deceased minor, Renee Rayborn, brought a wrongful death and survival action against various defendants involved in her prenatal care, including Ingalls Memorial Hospital (Ingalls), St. Francis Hospital & Health Center (St. Francis), Lincoln Medical Center, and Drs. Imre Hidvegi, James A. Threatte, Hee Han Kim, individually and as agents or employees of Lincoln Medical Center. Subsequently, defendants filed a motion for summary judgment, arguing, *inter alia*, that Johnson was unable to establish that defendants' alleged negligence proximately caused injury and subsequent death to Rayborn. The circuit court granted the motion for summary judgment and

1-09-0422

denied Johnson's motion for reconsideration.

The following issues are raised on appeal: (1) whether this court lacks jurisdiction to consider this appeal where Johnson filed her first amended complaint, adding additional parties and claims, without leave of court; (2) whether the circuit court properly determined that a causal connection is lacking between defendants' alleged negligence and the resulting injuries; and (3) whether the circuit court erred in allowing defendant Lincoln Medical Center to adopt the summary judgment motion of the other defendants. For the reasons that follow, we affirm the judgment of the circuit court.

BACKGROUND

The record reveals the following undisputed facts and procedural history. Chakena Johnson was born April 5, 1982. She had two children, one born on March 17, 1999, and the other born on November 2, 2000. Both children were delivered by cesarean section. Three months later, in February 2001, Johnson became aware that she was pregnant with her third child.

In June 2001, Johnson sought medical care at Lincoln Medical Center for her first prenatal visit. Lincoln Medical Center was a multispecialty clinic located across the street from Ingalls. Johnson was treated by defendant Dr. Imre Hidvegi, a semi-retired board-certified obstetrician. Dr. Hidvegi previously had staff privileges at multiple hospitals, including Ingalls and St. Francis, where he had practiced and delivered babies for over 30 years. However, in 2000, Dr. Hidvegi voluntarily retired his staff privileges and could no longer deliver babies.

Dr. Hidvegi provided prenatal care for patients who would deliver at Ingalls by obstetricians affiliated with the Hayes Obstetrical Group (the Hayes Group). The Hayes Group

had a contract with Lincoln Medical Center and its obstetricians had staff privileges at Ingalls. According to the protocol at Lincoln Medical Center, those patients who were seen by Dr. Hidvegi for prenatal care were to be seen by one of the obstetricians in the Hayes Group in their last month of pregnancy.

At Johnson's June 21 visit, Dr. Hidvegi examined her and instructed her to return for follow-up care in two weeks. About six weeks later, on August 3, 2001, Johnson sought medical care at Ingalls Hospital complaining of light vaginal bleeding and cramping. At that time, Dr. James Threatte of the Hayes Group ordered an ultrasound and fetal monitoring both of which were normal. Dr. Threatte had previously treated Johnson when she delivered her second child. Johnson was instructed to follow up at Lincoln Medical Center and was told to immediately return to the hospital if she experienced any heavy vaginal bleeding.

Thereafter, on August 23, 2001, Johnson sought prenatal care at Lincoln Medical Center, complaining of abdominal pain and vomiting. Dr. Hidvegi examined her and referred her for an ultrasound, which was normal. He informed Johnson that since she already had two previous cesarean sections, it was likely that she would also have a cesarean section with this pregnancy. Dr. Hidvegi instructed her to return for a follow-up visit in two weeks.

On November 1, 2001, Johnson returned to Lincoln Medical Center complaining of a cold and was seen by defendant, Dr. Hee Han Kim, a board-certified family practice physician. At that time, Dr. Kim was aware that Johnson was eight months pregnant. Johnson had no complaints regarding her pregnancy and Dr. Kim did not provide her with any care related to her pregnancy at that visit. Dr. Kim referred Johnson back to Dr. Hidvegi and provided her with a referral for an

obstetrical visit. According to Johnson, she already had a prenatal visit scheduled with Dr. Hidvegi for November 5, 2001.

On November 5, 2001, Johnson saw Dr. Hidvegi for prenatal care at Lincoln Medical Center. She was 37 to 38 weeks pregnant and weighed 216 pounds. Dr. Hidvegi performed an examination. Johnson reported fetal movement, but Dr. Hidvegi had difficulty hearing a fetal heart tone and instructed Johnson to go to Ingalls labor and delivery department to obtain fetal heart monitoring and an ultrasound to establish the well-being of the baby.

Johnson went to Ingalls where she was informed that the hospital would not accept her insurance. She was told to go to St. Francis for services. Thereafter, Johnson went directly to St. Francis where she was seen and examined by Deidre Bell, a labor and delivery nurse. Johnson informed Bell that Dr. Hidvegi wanted her tested for fetal heart tones and wanted her to have an ultrasound. Nurse Bell took a history from Johnson, which included her previous cesarean sections, and placed her on an external fetal heart monitor for approximately 45 minutes. Johnson informed her that she had been having some contractions. The monitor as well as palpation revealed what Nurse Bell deemed to be mild to moderate Braxton Hicks contractions, which were not labor contractions. The monitor also revealed reassuring heart tones. Johnson had no complaints of pain or bleeding, and there was nothing unusual about the way Johnson felt that day.

Nurse Bell advised the on-call obstetrician at St. Francis, Dr. Edward Coupet, of the results of the fetal heart monitor, including the contraction pattern, and the history as relayed to her by Johnson. Dr. Coupet advised Nurse Bell to contact Johnson's treating doctor, Dr.

Hidvegi, concerning those findings, as well as any follow-up care, and the need for an ultrasound. According to Nurse Bell, she contacted Dr. Hidvegi and informed him of the reassuring results of the fetal monitoring, and about the mild to moderate contractions. Her care notes reveal that Johnson was to call or return to see Dr. Hidvegi to have the ultrasound done, and that Dr. Hidvegi agreed to see Johnson. Dr. Coupet ordered that Johnson be discharged and return to see Dr. Hidvegi. The discharge notes revealed that Johnson was ambulatory in stable condition and that she was going back to Dr. Hidvegi for follow-up care.

After being discharged from St. Francis, Johnson spoke with Dr. Hidvegi's nurse over the telephone. Johnson relayed to the nurse her experience at Ingalls, told her that she had fetal monitoring at St. Francis and told her that the results were positive. The nurse told Johnson that she would notify Dr. Hidvegi. Johnson intended to see Dr. Hidvegi at her next scheduled visit in two weeks. The rest of the day on November 5th was uneventful for Johnson and she noticed no changes in her physical condition between the time she left St. Francis and the time she went to bed that night.

The next day, on November 6, 2001, Johnson stayed in bed to rest. She continued to have slight contractions which would last for "like one hour" and then would "just go away and be nonexistent for like seven or eight hours." She noticed no change in the contractions until about 3 or 4 a.m. on November 7, 2001, when she began to experience a severe and constant pain along with more frequent, stronger contractions. She was taken to Ingalls where she had an emergency cesarean section. Upon surgery, it was discovered that she had ruptured her uterus and the baby was inside the abdominal cavity. The baby, Renee Rayborn, was diagnosed with brain damage

1-09-0422

and subsequently died on November 17, 2001.

Thereafter, on October 13, 2003, Johnson, as special administrator of the estate of Rayborn, filed a two-count wrongful death and survival action against Ingalls and the delivery doctor, Dr. Tony Jones, alleging negligence arising out of her care and treatment in the delivery on November 7, 2001. That complaint was never served on those parties.

Three weeks later, on November 5, 2003, Johnson filed her first amended complaint without leave of court. Therein, Johnson again asserted wrongful death and survival claims in her capacity as special administrator. She dropped Dr. Jones from the suit and added several defendants, including St. Francis, Lincoln Medical Center, and Drs. Hidvegi, Threatte,[1] and Kim, individually and as agents of Lincoln Medical Center. Therein, she alleged that on or about November 7, 2001, defendants were negligent in failing to render proper medical care and treatment and negligently failed to timely deliver her baby. Additionally, Johnson added individual claims against these defendants for medical negligence and claims under the Family Expense Act.

The case proceeded with discovery. On November 10, 2005, Johnson voluntarily dismissed Dr. Kim pursuant to section 2-1009 of the Code of Civil Procedure (735 ILCS 5/2-1009 (West 2004)). Thereafter, on November 9, 2006, Johnson refiled her action against Dr. Kim, alleging, *inter alia*, that Dr. Kim negligently failed to refer Johnson to a specialist capable of

---

[1] Dr. Threatte's motion to dismiss was granted on January 27, 2005, without prejudice pursuant to section 2-1010 of the Code of Civil Procedure (735 ILCS 5/2-1010 (West 2004)) due to the fact that he did not treat Johnson during the period of time alleged in the first amended complaint.

providing proper medical care. This new action was then consolidated with the action filed in 2003.

Subsequently, on September 25, 2008, Ingalls filed a motion for summary judgment which was adopted by Dr. Hidvegi, Dr. Kim, and St. Francis. Therein, defendants argued that summary judgment was warranted because Johnson failed to present competent evidence to establish that the alleged deviations from the standard of care proximately caused the injury and subsequent death. Defendants attached to their motion for summary judgment the depositions of Johnson, Dr. Hidvegi, Nurse Bell, and Johnson's medical expert, Dr. Charles Bird, as well as Dr. Bird's answers to interrogatories pursuant to Supreme Court Rule 213(f)(3). 210 Ill. 2d R. 213(f)(3).

In Dr. Bird's opinion, Dr. Hidvegi deviated from the standard of care by failing to advise Johnson on November 5 that she was at an increased risk for a ruptured uterus due to her two prior cesarean sections. He explained that a scar from a previous cesarean section lacks the strength of normal uterine tissue. As the uterus contracts, it begins to thin from the forces of the contractions, and in a small percentage of patients, the pressure is sufficient enough that a rupture can occur. Johnson was never advised of the risks associated with her condition.

In Dr. Bird's opinion, had Johnson been referred to an appropriate delivering obstetrician on November 5, Dr. Bird initially stated that the standard of care would have required that Johnson have very close observation, meaning visits every other day or third day, that she be made aware that she was very high risk, and that if she had any problems she should notify the Hayes Group and be "evaluated appropriately."

Dr. Bird believed to a reasonable degree of medical certainty that the outcome of the case

would have been different had Dr. Threatte or one of his obstetrical associates seen her on November 5. The standard of care would have required him to discuss a delivery plan with Johnson. If she decided to have a repeat cesarean section, they would have scheduled it for a date in the 39th week which would be approximately the 10th or 12th of November. If, alternatively, she chose a "vaginal birth after cesarean" (VBAC) and a trial of labor, she would have been instructed to contact him or one of his associates if she had any contractions.

Then he stated that given her presentation on November 5, it would have been within the standard of care for an obstetrician to perform a cesarean section, or after thorough instructions to the patient regarding the significance of her risk, let her go home, probably see her the next day if nothing has changed, or admit her to the hospital for continued observation. He agreed that other than what the standard of care required, he would not speculate as to what would have happened to Johnson had she been seen by Dr. Threatte on November 5, 2001, stating, "I'm not a swami."

Dr. Bird agreed that if an obstetrician had chosen not to perform a cesarean section on November 5, his conduct would have been an exercise of medical judgment within the standard of care. He agreed that given Johnson's presentation with a history of two cesarean sections, 37 or 38 weeks pregnant, presenting with concerns about fetal well-being because heart tones couldn't be heard, presenting with an irregular contraction pattern as noted on the fetal monitor strips, and having a closed cervix and no indications of being in active labor, the standard of care did not require that a cesarean section be performed on November 5, 2001. Nevertheless, Dr. Bird stated that had the standard of care been followed in this case, "I really feel she would have been

delivered before the uterine rupture."

Dr. Bird was critical of Ingalls for failing to refer Johnson to labor and delivery to have the necessary monitoring. If they had done that, then Johnson would have had a proper evaluation which may or may not have included an ultrasound, and she should have then been seen by a doctor in the Hayes Group who could have made a medical decision whether a cesarean section should be performed based on "all the factors that this doctor from the Hayes group would have received from the patient and the nurses at Ingalls."

He then acknowledged that if the fetal heart tones were reassuring, then an ultrasound would not have been required under the standard of care. He had no opinion as to what a sterile vaginal examination would have shown if it had been performed prior to 4 a.m. on November 7. He had no opinion as to what a fetal ultrasound would have shown if performed on November 5. He indicated he was not qualified to give an opinion as to whether ultrasounds are reliable indicators to show early signs of placental abruption. He agreed that he would "have no idea what they would have done" if they had evaluated Johnson in labor and delivery at Ingalls.

With respect to St. Francis, Dr. Bird opined that St. Francis deviated from the standard of care by Dr. Coupet's failure to evaluate Johnson and by monitoring her for only 45 minutes. The standard of care required a minimum of three hours. It was a deviation from the standard of care for St. Francis and Dr. Coupet to discharge the patient without a delivery plan in effect. Johnson was given a false sense of reassurance about her condition at the time she left the hospital.

Dr. Bird acknowledged that throughout the time Johnson was at St. Francis she did not display any symptoms that suggested a placental abruption or uterine rupture. He believed the

contractions on the fetal monitor strip "might be meaningful," but it would depend on the interpretation of the medical health professional taking Johnson's history in consideration. He agreed that he had no way of knowing what the fetal monitor strips would have shown had she been monitored for a longer period of time. He could not give an opinion as to whether Johnson's contraction pattern would have changed between the time she was discharged from St. Francis until 4 a.m. on November 7 when the rupture occurred. Had Dr. Coupet evaluated and monitored Johnson for additional time, and had the cervix remained closed, and had the contraction pattern remained irregular, Dr. Coupet would have complied with the standard of care had he sent Johnson home with instructions to follow up with Dr. Threatte.

Dr. Bird was then asked questions regarding informed consent which he stated requires communication with the patient to inform her of the potential ways to treat her condition. If Johnson had chosen a cesarean section after being advised of all of the risks, the standard of care would have required the physician to do it. However, contrary to Johnson's statement of facts, and as conceded by counsel at oral argument, the record reveals that Johnson was never asked nor did she ever testify at her deposition that if had she been given the option to have a cesarean section on November 5 she would have chosen that option.[2]

In Johnson's response to the motion for summary judgment, she argued that if Johnson had been referred to the appropriate physician with delivery privileges and closely monitored "then the lack of communication and the falling between the cracks that occurred at Ingalls and St. Francis never would have occurred." If the standard of care had been met, Johnson would

---

[2] Accordingly, we grant defendants' motion to strike the statement from Johnson's brief.

have either been admitted to the hospital, had a cesarean section that day or would have been seen the next day for a complete evaluation, and would have delivered her baby prior to the rupture of her uterus.

On November 14, 2008, the circuit court granted summary judgment in favor of defendants, finding that "after reviewing all those documents and hearing the oral argument of counsel, the court is still left with what I would characterize as a vortex of facts in this case that have any connection whatsoever between the injury of [Johnson] and her child to the conduct of [defendants]."

At that time, Johnson also filed a motion for entry of a default judgment against Lincoln Medical Center. Lincoln Medical Center had been served on January 28, 2004. It had filed for bankruptcy protection and was subject to an automatic stay in the bankruptcy court. However, Johnson attached a copy of a dismissal order issued by the Bankruptcy Court for the Northern District of Illinois, dated September 14, 2004. On November 21, 2008, the circuit court denied Johnson's motion for default, and granted Lincoln Medical Center until December 2, 2008, to file its appearance and to otherwise plead. It filed its appearance on November 25, 2008, and on December 2, 2008, it filed a motion to adopt the summary judgment motions previously filed by the other defendants.

On December 11, 2008, Johnson filed a motion to reconsider the circuit court's order granting summary judgment to the other defendants. Therein, she reiterated that Dr. Bird testified that the standard of care required defendants to treat her as a high-risk pregnancy. Had they done that, she "would have understood the risks of allowing her contractions to proceed and obtained

the treatment she required before her uterus ruptured."

On January 14, 2009, Johnson filed a motion to strike Lincoln Medical Center's motion to adopt the other defendants' motion for summary judgment and, alternatively, responded to its motion for summary judgment. Thereafter, on February 5, 2009, the circuit court allowed Lincoln Medical Center's motion to adopt the summary judgment motions of the other defendants, denied Johnson's motion to strike that pleading, granted summary judgment to Lincoln Medical Center, and denied Johnson's motion for reconsideration of the order of November 14, 2008, granting summary judgment to the other defendants.

ANALYSIS

I. Jurisdiction

Initially, we consider defendants' argument, raised for the first time on appeal, that Johnson's failure to obtain leave of court before filing her first amended complaint adding additional parties deprived the circuit court of jurisdiction, rendering the amended complaint a nullity and requiring this court to dismiss the appeal.[3] Johnson filed her original complaint on October 13, 2003. Three weeks later, on November 5, 2003, within the time frame for serving the original defendants, Johnson filed an amended complaint, without leave of court, dropping a defendant, adding new defendants, and adding new claims. Johnson maintains that defendants forfeited this issue not only by their failure to raise it in the circuit court, but also because they were properly served, they appeared, and they participated in the merits of the litigation for

---

[3] We note that Ingalls does not raise this issue on appeal because it was already a party to the original complaint.

1-09-0422

several years.

Amendments to pleadings are governed by section 2-616 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-616 (West 2002)). Specifically, section 2-616(a) provides that at any time before final judgment, amendments to pleadings, including those adding parties or causes of action, "*may be allowed* on just and reasonable terms." 735 ILCS 5/2-616 (West 2002) (Emphasis added). Thus, under the statute, a party's right to amend a pleading is not absolute or unlimited (Lee v. Chicago Transit Authority, 152 Ill. 2d 432, 467 (1998)), and it has been generally held that a party is required to obtain the court's permission to file an amendment (Savage v. Mui Pho, M.D., 312 Ill. App. 3d 553, 557 (2000); Stichauf v. Cermak Road Realty, 236 Ill. App. 3d 557, 564 (1992)).

Nevertheless, courts are conflicted as to the consequences of the failure to obtain leave of court. Specifically, the question we are presented with is whether the failure to obtain leave to amend to add new claims and new parties is a jurisdictional defect which renders the amendment a nullity or whether the failure is a procedural deficiency that can be forfeited if raised for the first time on appeal.

Several appellate court decisions stand for the proposition that it is "well settled" that the requirement to obtain leave is jurisdictional and, therefore, an amendment filed without leave of court is a "nullity" and not subject to forfeiture. See, *e.g.*, Stichauf, 236 Ill. App. 3d at 564 ( "A court does not have jurisdiction over a party where leave is not granted to amend the complaint to add that party."); Callaghan Paving v. Keeneyville Construction Co., 197 Ill. App. 3d 937, 939 (1990) (finding the error jurisdictional and holding that "a pleading filed without leave of court

- 13 -

must be disregarded on review"). However, the holdings in these cases have been called into question by subsequent decisions of the supreme court and appellate court. Ragan v. Columbia Mutual Insurance Co., 183 Ill. 2d 342 (1998); Fischer v. Senior Living Properties, L.L.C., 329 Ill. App. 3d 551 (2002); Ganci v. Blauvelt, 294 Ill. App. 3d 508 (1998). Thus, we consider the jurisdictional question as it relates specifically to the facts presented here.

We begin our analysis with an understanding of the circuit court's jurisdiction, a question subject to *de novo* review. In re Estate of Ahern, 359 Ill. App. 3d 805, 809 (2005). The court's jurisdiction is composed of two aspects including subject matter and personal jurisdiction. In re M.W., 232 Ill. 2d 408, 414 (2009). Subject matter jurisdiction refers to the court's power "to hear and determine cases of the general class to which the proceeding in question belongs." Belleville Toyota, Inc. v. Toyota Motor Sales U.S.A., Inc., 199 Ill. 2d 325, 334 (2002). In the general civil context, circuit courts enjoy, with limited exceptions, "original jurisdiction of all justiciable matter." Ill. Const. 1970, art. VI, §9; see Steinbrecher v. Steinbrecher, 197 Ill. 2d 514, 529-30 (2001).

In Ragan, the supreme court addressed the issue of the court's subject matter jurisdiction in the context of a plaintiff who amended his complaint without leave of court to add a claim for prejudgment interest. The defendant did not object, filed a responsive pleading, and the prejudgment interest was awarded. Ragan, 183 Ill. 2d at 354. On appeal, the defendant argued for the first time that the circuit court lacked jurisdiction over the amended complaint, citing a line of cases in support, including Greene v. Helis, 252 Ill. App. 3d 957 (1993); Torley v. Foster McGraw Hospital, 116 Ill. App. 3d 19 (1983); and Glickauf v. Moss, 23 Ill. App. 3d 679 (1974).

Ragan, 183 Ill. 2d at 354.

In rejecting the defendant's jurisdictional argument, the supreme court found these cited cases to be "unpersuasive." Ragan, 183 Ill. 2d at 354. Additionally, the court distinguished these cases on the basis that they involved an amendment to add a new party, rather than a new claim against a party already before the court. The court focused on the liberal pleading requirements in the Code of Civil Procedure aimed at the substantive rights of the parties. Ragan, 183 Ill. 2d at 354. The court reasoned that "to interpret the failure to obtain leave to add a prayer for relief against a party already before the court as a jurisdictional defect would frustrate the purpose of the foregoing provisions." Ragan, 183 Ill. 2d at 354. Accordingly, the court held that the "failure to obtain leave to amend a complaint is not a jurisdictional defect and that a party may waive its right to object to the defect." Ragan, 183 Ill. 2d at 354. By its holding, the supreme court was recognizing the circuit court's subject matter jurisdiction over the newly-added claim.

Additionally, the appellate court in Ganci specifically addressed whether the failure to obtain leave to file a third-party complaint bringing in an additional party deprived that court of jurisdiction to hear that complaint. Ganci, 294 Ill. App. 3d at 515-16. Therein, the court rejected the proposition of law that an amended complaint adding a party without leave of court was a nullity. The court explained that "treating obtaining leave as an element of jurisdiction is contrary to the most recent theories of circuit court jurisdiction." Ganci, 294 Ill. App. 3d at 516. The court reiterated that circuit court jurisdiction is conferred by the constitution and strict compliance with the statute is no longer necessary. Ganci, 294 Ill. App. 3d at 519; accord Fischer, 329 Ill. App. 3d at 555 (rejecting the idea that filing an amended complaint without obtaining leave

constituted a jurisdictional error); see also In re Estate of Zander v. Illinois Department of Public Aid, 242 Ill. App. 3d 774, 777 (1993) (provision of section 2-616 requiring permission is directory, not mandatory, and may be forfeited).

Furthermore, we find that the cases holding that failure to obtain leave is a jurisdictional defect, including Stichauf and Callaghan, rely for authority on cases found by the court in Ragan to be unpersuasive. See Ragan, 183 Ill. 2d at 534. Additionally, the holdings in those cases are stated without any rationale or analysis of the modern trend of cases related to jurisdiction, and without any discussion specifying which aspect of jurisdiction the court was considering. See, e.g., Allen v. Archer-Daniels-Midland Co., 129 Ill. App. 3d 783, 786 (1985) (merely stating that the rule is "undisputed"); Petrella v. Leisky, 92 Ill. App. 3d 880, 881-82 (1981) (merely states the rule was to be "found in Illinois case law"); George F. Mueller & Sons, Inc. v. Volpe, 74 Ill. App. 3d 879, 881 (1979) (court held that the amended complaint was "void" without any citation to authority, and stated that the rationale was based on the "orderly administration of legal proceedings"); see also Midwest Bank and Trust Co. v. Village of Lakewood, 113 Ill. App. 3d 962, 967-68 (1983); Hallmark Personnel, Inc. v. Pickens-Kane Moving & Storage Co., 82 Ill. App. 3d 18, 22 (1980) (merely stating that an amended complaint without leave "should be disregarded on appeal").

Accordingly, we find the circuit court had subject matter jurisdiction to hear and determine Johnson's amended complaint despite the procedural failure to obtain leave because it was "a justiciable matter to which the court's constitutionally granted original jurisdiction extends." Belleville Toyota, 199 Ill. 2d at 340. See Ragan, 183 Ill. 2d at 534; Fischer, 329 Ill.

1-09-0422

App. 3d at 555; <u>Ganci</u>, 294 Ill. App. 3d at 516; and <u>In re estate of Zander</u>, 242 Ill. App. 3d at 777.

With respect to the court's personal jurisdiction over the parties, it is well settled that personal jurisdiction may be acquired over a defendant by his appearance or by effective service of summons. <u>In re M.W.</u>, 232 Ill. 2d at 426. It is undisputed that defendants appeared and were served with summons. Even if there were deficiencies, section 2-301(a-5) of the Code of Civil Procedure specifically provides that a party forfeits all objections to the court's personal jurisdiction over the party by filing a responsive pleading or motion (other than one seeking an extension of time to answer or otherwise appear). 735 ILCS 5/2-301(a-5) (West 2004); <u>In re Estate of Pellico</u>, 394 Ill. App. 3d 1052, 1066 (2009). Here, under these circumstances, defendants appeared, filed an answer, and filed numerous motions including motions to dismiss and for summary judgment. They participated in the proceedings for several years. Therefore, defendants have forfeited any purported objection to the court's personal jurisdiction over them. 735 ILCS 5/2-301(a-5) (West 2004).

Accordingly, the failure to obtain leave of court to add a party is not, in and of itself, a jurisdictional defect, rendering the amendment a "nullity." Rather, the failure to obtain leave of court to amend a complaint is a procedural deficiency, and any failure to timely object to it is subject to forfeiture. See <u>Ragan</u>, 183 Ill. 2d at 534; <u>Fischer</u>, 329 Ill. App. 3d at 555; <u>Ganci</u>, 294 Ill. App. 3d at 516; and <u>In re Estate of Zander</u>, 242 Ill. App. 3d at 777. See also <u>Pestka v. Town of Fort Sheridan Co.</u>, 371 Ill. App. 3d 286 (2007) (where the defendant timely objected to the failure to obtain leave in the circuit court).

- 17 -

Given that the court had subject matter jurisdiction over the claims as well as personal jurisdiction over the parties, the amended complaint and subsequent judgment of the circuit court could not be deemed a "nullity" or void. Accordingly, where defendants failed to object to the filing without leave of court, and instead filed an answer, motions, and argued the merits of the pleadings, defendants' claim is procedurally forfeited. Ragan, 183 Ill. 2d at 355 (a question not raised in the circuit court cannot be raised for the first time on appeal).

In a related argument, Dr. Kim contends for the first time on appeal that Johnson's claims against him are barred by the statute of limitations and repose applicable to medical malpractice actions. Specifically, he argues that since the amended complaint was a "nullity," any subsequent refiling in 2006 of the voluntarily dismissed lawsuit against him could not relate back to the invalid filing of the amended complaint. Therefore, the filing of the lawsuit in November 2006 was barred by the statute of limitations and repose applicable to medical malpractice actions because the injury accrued on November 1, 2001. We need not address this argument because we have rejected Dr. Kim's premise, finding that the amended complaint was not a "nullity." Accordingly, Dr. Kim's argument lacks merit.

II. Summary Judgment

We next consider Johnson's contention that the circuit court erred in granting summary judgment in favor of defendants. Summary judgment is proper where the pleadings, depositions, admission, and affidavits on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2006). Although the nonmoving party

is not required to prove her case at the summary judgment stage, she must nonetheless present a factual basis that would arguably entitle her to judgment. McNamee v. Sandore, 373 Ill. App. 3d 636, 648 (2007). If the plaintiff fails to establish an element of her cause of action, summary judgment is proper. Bagent v. Blessing Care Corp., 224 Ill. 2d 154, 163 (2007). In appeals from summary judgment rulings, our review is *de novo*. Bagent, 224 Ill. 2d at 163.

To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care. Purtill v. Hess, 111 Ill. 2d 229, 241-42 (1986).

The question raised on appeal is whether Johnson's expert adequately established a material question of fact regarding whether defendants' alleged negligent treatment proximately caused the injury and subsequent death. Although the issue of proximate cause is generally a question of fact, at the summary judgment stage the plaintiff must present some affirmative evidence that it is "more probably true than not true" that the defendant's negligence was a proximate cause of the plaintiff's injuries. Borowski v. Von Solbrig, 60 Ill. 2d 418, 424 (1975); Weidenbeck v. Searle, 385 Ill. App. 3d 289, 292 (2008).

Proximate cause must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be "contingent, speculative, or merely possible." Ayala v. Murad, 367 Ill. App. 3d 591, 601 (2006). An expert's opinion is only as valid as the basis for the opinion. Weidenbeck, 385 Ill. App. 3d at 293. Conclusory opinions based on sheer, unsubstantiated speculation are irrelevant. Weidenbeck, 385 Ill. App.3d at 293.

With these principles in mind, we consider whether Johnson has presented some affirmative evidence of a causal nexus between the alleged deviations and the injury. On appeal, in her opening brief, Johnson's theory of the case is that defendants' deviations from the standard of care "increased her risk of harm." Specifically, she argues that by failing to communicate to Johnson about the increased risk of uterine rupture, and by failing to refer her to an obstetrician with delivery privileges on November 5, 2001, she did not receive "the treatment she required." Had she been seen by the appropriate physician she would have had a cesarean section prior to her ruptured uterus on November 7, 2001, which would have prevented her injuries and the subsequent death of her child.

At oral argument, Johnson maintained that the "overriding deviation" from the standard of care as expressed by Dr. Bird was allowing Johnson to return home on November 5th without explaining the significance of her contractions and increased risk of uterine rupture. She should have been informed of the need to return to the hospital if she was continuing to experience contractions. Had she been aware of the significance of the contractions she would have had the appropriate care which would have prevented the rupture.

Dr. Bird testified that had Dr. Kim or Dr. Hidvegi complied with the standard of care, there were several factual scenarios that might have occurred. Dr. Threatte or another Hayes Group obstetrician would have discussed delivery options including both a cesarean section and a "vaginal birth after cesarean" (VBAC) which would entail a trial of labor. The obstetrician would have outlined a plan of management which could have included a myriad of acceptable options. He could have scheduled a cesarean section for November 10 or his plan "could have even

include[d] a cesarean section at that time based on everything that he found." Alternatively, his management plan could have been, after thorough instructions to the patient, close observation with either follow-up visits every other day or "let her go home, probably see her the next day if nothing has changed," or "admit her to the hospital for continued observation."

Dr. Bird indicated that any of these options would have been within the appropriate standard of care, and agreed that other than what the standard of care required, he would not speculate as to what would have happened to Johnson had she been seen by Dr. Threatte on November 5. Notably, Dr. Threatte was deposed, but was never asked, nor did he give any opinion, on what treatment he would have provided to Johnson had she been seen by him on November 5, or whether he would have provided a different course of treatment had Johnson been referred to him. See Holton v. Memorial Hospital, 176 Ill. 2d 95 (1997) (where evidence was presented by the treating doctor that a different course of treatment would have been provided).

As to the first option, it is undisputed that a scheduled cesarean section after November 7 could not have prevented the uterine rupture. Furthermore, despite Dr. Bird's conclusory assertion that Dr. Threatte could have done a cesarean section "based on everything that he found," Dr. Bird acknowledged that given Johnson's presentation on November 5th, including her irregular contraction pattern as noted on the fetal monitor strips at St. Francis, her closed cervix, and no other indication of being in labor, the standard of care did not require that Johnson have a cesarean section on November 5. Rather, he stated that given her presentation, it would have been an exercise of medical judgment within the standard of care not to have done a cesarean

section that day.

Thus, there was no expert testimony to a reasonable degree of medical certainty that a referral by any defendant to a delivering obstetrician would have led to the need for surgical intervention on November 5 and, therefore, no evidence that the alleged deviations from the standard of care "increased her risk of harm." Furthermore, we have previously held that merely stating that treatment would have been sooner and sooner would have been better is insufficient to establish proximate cause. Weidenback, 385 Ill. App. 3d at 294. Similarly, here, the expert's opinion would have left a jury to improperly speculate as to when definitive treatment would have been undertaken.

With respect to the second option, to provide thorough instructions to the patient regarding her risk of rupture and instruct her to return for follow-up care the next day, Dr. Bird had no opinion as to what would have been revealed had Johnson returned the next day that would have caused a need for intervention. He agreed that she was not in early labor. He did not have an opinion regarding what an ultrasound would have shown or what a vaginal exam would have shown had she been further evaluated prior to 4 a.m. on November 7. He had no opinion as to whether Johnson's contraction pattern would have changed between the time she was discharged from St. Francis on November 5 until 4 a.m. on November 7. Johnson's own testimony revealed that she experienced no changes in her intermittent contraction pattern, from the time she left St. Francis until 4 a.m. on November 7.

Thus, there was no testimony regarding what developments in her condition would have occurred even had she understood the significance of her risk and returned the next day that

would have caused an obstetrician to intervene and do a cesarean section prior to 4 a.m. on November 7. Without any factual support for Dr. Bird's conclusions that a cesarean section would have been done sooner, the conclusion alone cannot create a question of fact. Weidenbeck, 385 Ill. App. 3d at 294.

The same result applies to Dr. Bird's third option, continued monitoring in the hospital. Dr. Bird had no opinion as to what would have been revealed had Johnson been further monitored at Ingalls or St. Francis. Although he criticized St. Francis for failing to continue fetal monitoring for more than 45 minutes, Dr. Bird could not render an opinion as to what a fetal monitor would have shown had she been monitored for a longer period. He did not have an opinion regarding what an ultrasound would have shown or what a vaginal exam would have shown had she been further evaluated prior to 4 a.m. on November 7. According to Johnson, there was no change in her intermittent contraction pattern.

We find Johnson v. Loyola University Medical Center, 384 Ill. App. 3d 115 (2008), to be illustrative. There, in a failure to adequately monitor case, the court found sufficient evidence to establish proximate cause where the expert testified that had the patient been adequately monitored, changes in his heart rate, cardiac status, or oxygen levels would have been revealed, leading to earlier intervention and treatment for the patient's impending cardiac arrest. Johnson, 384 Ill. App. 3d at 272. In contrast, here, it is merely a possibility that additional monitoring would have caused earlier intervention. The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation. Susnis v. Radfar, 317 Ill. App. 3d 817, 827 (2000).

1-09-0422

Johnson cites Northern Trust Company v. University of Chicago Hospitals and Clinics, 355 Ill. App. 3d 230 (2004), Walton v. Dirkes, 388 Ill. App. 3d 58 (2009), Wodziak v. Kash, 278 Ill. App. 3d 901 (1996), and Holton v. Memorial Hospital, 176 Ill. 2d 95 (1997), in support of her argument that she has established sufficient evidence as to causation.

We find these cases distinguishable. Initially, these cases involved a failure to diagnose or a delay in diagnosis which resulted in a delay in treatment or which lessened the effectiveness of treatment. Furthermore, the expert causation opinions in these cases were not merely contingent, speculative or possible. In Northern Trust Co., the expert specifically testified that had the fetal heart monitor been placed at 3:30 p.m., as required by the standard of care, an abnormal fetal heart rate would have been revealed, and the need for a cesarean section would have been recognized, and performed no later than 4:30 p.m. Northern Trust Co., 355 Ill. App. 3d at 238-39.

In Walton, the expert testified that the defendant's negligent failure to order a blood test resulted in a delayed diagnosis of leukemia. Had the test been done timely, an abnormality in the blood would have been detected, certain specific procedures would have been undertaken and his condition treated. Walton, 388 Ill. App. 3d at 67-68. Similarly, in Wodziak, a delay in diagnosing a stenosis lessened the effectiveness of the "definitive treatment" for the stenosis because the emergency treatment the patient received was less effective. Wodziak, 278 Ill. App. 3d at 912.

In Holton, a delay in reporting the patient's progression of paralysis lessened the effectiveness of treatment. There was expert testimony that had the doctors been given the

- 24 -

opportunity to properly diagnose her condition based on accurate and complete information, they would have had an opportunity to treat her paralysis by ordering the appropriate surgical intervention to ease the pressure on the spinal cord. Because of the hospital's negligent failure to accurately and timely report her symptoms, the appropriate treatment could not even be considered. Holton, 176 Ill. 2d at 108.

In contrast, as we have discussed, there is insufficient evidence here to support a causal nexus between the alleged deviations from the standard of care and the resulting injury and subsequent death. Therefore, the circuit court properly granted summary judgment in defendants' favor.

III. Local Rule Violation

Lastly, we address Johnson's contention that the circuit court erred in allowing Lincoln Medical Center to adopt the other defendants' motions for summary judgment because it violated Supreme Court Rule 191(a) (210 Ill. 2d R. 191(a)), providing that motions for summary judgment "must be filed before the last date, if any, set by the trial court for the filing of dispositive motions," and Cook County Circuit Court Rule 2.1(f), which provides that a motion for summary judgment must be presented to the court at least 45 days before the trial date "except by prior leave of court and for good cause shown." Cook Co. Cir. Ct. R. 2.1(f) (eff. June 15, 1988).

Generally, decisions made by a trial judge with respect to case management are reviewed for abuse of discretion. In re D.T., 212 Ill. 2d 347, 356 (2004). The trial date was originally set for November 10, 2008. Lincoln filed its motion to adopt on December 2, 2008. Nevertheless, during the pendency of the summary judgment proceedings, the trial date was continued.

1-09-0422

Accordingly, at the time Lincoln Medical Center filed its motion to join, there was no definitive trial date assigned to the case.

Furthermore, we find no grounds for reversal where, as here, there were no genuine issues of material fact for a jury to consider. Seef v. Ingalls Memorial Hospital, 311 Ill. App. 3d 7, 18-19 (1999) (late filing of motion in violation of local rule not grounds for reversal where there was no issue of material fact for jury to consider). Here, the liability of Lincoln Medical Center is predicated upon the alleged acts of its agents or employees, Dr. Kim and Dr. Hidvegi. The law is clear that the claims asserted against Lincoln Medical Center under the theory of vicarious liability and those claims asserted against Dr. Kim and Dr. Hidvegi are "one and the same." Towns v. Yellow Cab Co., 73 Ill. 2d 113, 123-24 (1978). These defendants are all "unified tortfeasors." Towns, 73 Ill. 2d at 124. Accordingly, where the proximate cause was lacking as to the agents, the court would have properly granted a directed verdict for Lincoln Medical Center had it proceeded to trial.

Accordingly, for all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and KARNEZIS, JJ., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

CHAKENA JOHNSON, Individually and as Special Administrator of the Estate of Renee Rayborn, Deceased,

　　　Plaintiff-Appellant,

　　v.

INGALLS MEMORIAL HOSPITAL, a Corporation, ST. FRANCIS HOSPITAL & HEALTH CENTER, a Corporation, LINCOLN MEDICAL CENTER, LTD., a Corporation, and IMRE HIDVEGI, JAMES A. THREATTE, and HEE HAN KIM, Individually and as Agents or Employees of LINCOLN MEDICAL CENTER, LTD., a Corporation,

　　　Defendants-Appellees.

**No. 1-09-0422**

**Appellate Court of Illinois**
**First District, Second Division**

**Filed: June 29, 2010**

**JUSTICE THEIS delivered the opinion of the court.**

**Cunningham, P.J., and Hoffman, J., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Claire E. McWilliams, Judge Presiding**

| For PLAINTIFF-APPELLANT | Barbara D. Klein<br>Kimberly R. Vaughn<br>Barbara D. Klein & Associates<br>33 N. Dearborn St., Ste. 1900<br>Chicago, Illinois 60606 | For DEFENDANT-APPELLEE<br>(Ingalls Memorial Hospital) | Steven C. Steinback<br>Scott E. Irvin<br>Barker & Castro, LLC<br>115 S. LaSalle St., Ste. 2900<br>Chicago, Illinois 60603 |
|---|---|---|---|
| For DEFENDANT-APPELLANT<br>(St. Francis Hospital and Health Center) | Julie A. Teuscher<br>Susan E. Conner<br>Cassiday Schade LLP<br>20 N. Wacker Dr., Ste. 1040<br>Chicago, Illinois 60606 | For DEFENDANT-APPELLANT<br>(Imre Hidvegi, M.D.) | Dennis A. Ferraro<br>Chuhak & Tecson, P.C.<br>30 S. Wacker Dr., Ste. 2600<br>Chicago, Illinois 60606 |
| For DEFENDANT-APPELLANT | Stephen A. Kolodziej<br>Amy L. Anderson | For DEFENDANT-<br>(Lincoln Medical | Ronald L. Boorstein<br>150 S. Wacker Dr., Ste. 450 |

1-09-0422

**(Hee Han Kim, M.D.)** **Brenner, Ford, Monroe & Scott, Ltd.** **Center, Ltd.)** **Chicago, Illinois 60606**
**33 N. Dearborn St., Ste. 300**
**Chicago, Illinois 60602**