SECOND DIVISION
Modified Opinion May 10, 2011

No. 1-10-0108

| | | |
|---|---|---|
| HEATHER GUSKI, Independent Administrator of the Estate of Gerald Parkison, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| ASIM RAJA and MIDWEST EMERGENCY ASSOCIATES, | ) ) ) | No. 2006 L 001965 |
| Defendants-Appellees | ) ) | |
| (Ingalls Memorial Hospital, | ) ) | Honorable Daniel M. Locallo, |
| Defendant). | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Cunningham and Justice Harris concur in the judgment.

## OPINION

Plaintiff Heather Guski brought wrongful death and survival actions against defendants Dr. Asim Raja, Midwest Emergency Associates, and Ingalls Memorial Hospital in her capacity as the independent administrator of the estate of her father, Gerald Parkison, who was found dead in his home four days after visiting the emergency room at Ingalls. After Ingalls settled with plaintiff, the remaining parties proceeded to trial. The circuit court entered a partial directed verdict in favor of defendants Raja and Midwest on one issue and a jury found in favor of the defendants on the remaining issues. Plaintiff now appeals, arguing that: (1) the circuit court erred

in several of its rulings on motions *in limine*; (2) defense counsel's closing argument was "unfair" and warrants reversal; (3) the cumulative effect of those errors requires that she receive a new trial; and (4) the jury's verdict was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

## I. BACKGROUND

On December 25, 1999, Gerald Parkison arrived at the emergency room at Ingalls Memorial Hospital. A triage nurse took information about Parkison's symptoms and Parkison then saw Raja, the emergency room doctor. Raja performed a medical examination of Parkison, diagnosed him with an upper respiratory infection, prescribed antibiotics, and sent Parkison home with instructions to follow up with his family doctor or return to the emergency room if his condition worsened. Four days later, Parkison was found dead in his home. Plaintiff theorized that Raja failed to take an adequate medical history of Parkison and failed to order a CT scan, which would have detected the subarachnoid hemorrhage, or bleeding in the brain, that induced Parkison's fatal cardiac arrhythmia. Defendants' theory of the case was that Parkison died of a myocardial infarction or arrhythmia caused by atherosclerosis and unrelated to a subarachnoid hemorrhage.

Before trial, each party filed numerous motions *in limine* seeking to exclude certain evidence. Of particular relevance in this case, defendants filed a motion *in limine* to exclude evidence demonstrating that on several occasions, Raja failed to pass the examination for board certification in internal medicine. They argued that Raja would testify as an occurrence witness and not an expert witness; thus, any evidence of his prior failed attempts at board certification in

an unrelated field was irrelevant. The court granted defendants' motion.

Defendants also filed a motion *in limine* to exclude testimony by one of plaintiff's experts, criticizing Raja's documentation of Parkison's symptoms on his medical chart. They argued that none of plaintiff's other experts would testify that such a failure was a proximate cause of Parkison's death. Plaintiff responded that "[t]here is no testimony that a failure to chart anything caused the guy's death," but argued that "what Dr. Raja charted and what he didn't chart becomes evidence of what his thought process was." The court granted defendants' motion.

Defendants also sought to exclude hearsay testimony offered by Parkison's family members that purported to demonstrate the severity of Parkison's headaches before going to the emergency room. The court allowed Parkison's ex-wife to testify that Parkison had headaches, that she called his doctor, and that she took him to the emergency room, for the limited purpose of explaining why she took him to Ingalls. However, plaintiff could not use that testimony as proof that Parkison was in fact suffering from headaches.

Plaintiff filed a motion *in limine* seeking to bar defense counsel from soliciting testimony from her expert about Parkison's use of marijuana, arguing that it was irrelevant to any issues in the case and that it was overly prejudicial. Defendants argued that the testimony rebutted plaintiff's claim that the only explanation for Parkison's passing out was that he was suffering from an aneurysm. The court denied plaintiff's motion.

The case proceeded to trial and the following relevant facts were adduced. Plaintiffs first called Raja to testify as an adverse witness. He testified that he was employed by Midwest, which contracted with Ingalls to provide emergency room doctors. He stated that when a patient arrives

in the emergency room, he first reviews the patient's medical chart, which contains information that the patient gave to the triage nurse. In this case, the triage nurse wrote that Parkison had been vomiting, experiencing dizziness and body aches, and had passed out twice over the previous three days. Parkison made similar complaints to an intake nurse.

Raja then conducted his own examination of Parkison, beginning with a conversation about Parkison's medical history. Raja acknowledged that Parkison did complain of vomiting, dizziness, and passing out, but he did not record that on Parkison's medical chart. Raja further testified that when he asked Parkison follow-up questions about those complaints, Parkison explained that he was no longer suffering from those symptoms, but that he had a cough, sinus pressure, and a sinus headache, which symptoms Raja also did not record on Parkison's medical chart. Raja testified that patients sometimes alter their statement of complaints between the time they arrive in the emergency room and the time they are seen by him. Raja said that Parkison told him that the coughing spells made him feel light-headed and dizzy, like he was going to pass out, but Parkison was not sure if he actually passed out.

Raja acknowledged that vomiting, dizziness, and passing out, collectively, could indicate that Parkison suffered from a serious intracranial condition. He acknowledged that under these circumstances, he was required to do a "neuro exam" and cranial nerve testing on Parkison, which included an examination of Parkison's eyes, ears, nose, throat, and facial muscles. Raja provided a detailed description of the "neuro exam" he performed on Parkison and described the results of that exam as normal. He documented that Parkison appeared normal. He also examined Parkison's lungs and found his breathing to be normal. He concluded that Parkison's clear nasal

drainage, aches, chills, and cough indicated that he had a viral upper respiratory infection.

Raja testified that he did not record Parkison's respiratory infection symptoms on his medical chart because he was using a new computerized documentation system at that time and he did not think he also needed to write the symptoms down. However, he did write orders on Parkison's chart.

Raja was asked about aneurysms specifically. He acknowledged that a CT scan is an appropriate method of investigating and diagnosing an aneurysm or a hemorrhage in the subarachnoid space in the skull. He testified that in the past, he has ordered CT scans when he believed patients had neurological problems. While practicing emergency medicine, he has diagnosed an aneurysm or subarachnoid hemorrhage about five to seven times. However, in this case, he did not order a CT scan for Parkison because he believed that Parkison had an upper respiratory infection. He testified that in his experience and personal knowledge, the "cardinal symptom" of a ruptured aneurysm is an "excruciating headache, the most severe headache you ever had in your life," which is a patient's prominent complaint. He stated he had never heard that a subarachnoid hemorrhage following a ruptured aneurysm could induce a cardiac arrhythmia.

Plaintiff then called Dr. Paul Stiegler to testify as an expert on the standard of care for emergency medicine physicians. Steigler opined that Raja deviated from the standard of care by not taking an adequate medical history of Parkison. He testified that after reviewing the triage nurse's notes on Parkison's medical chart, a reasonably careful physician would have investigated Parkison's complaints of vomiting, dizziness, passing out, and body aches as symptoms of either a

cardiac problem or a serious intracranial problem, like subarachnoid hemorrhage, encephalitis, or meningitis. Steigler testified that Raja's indications that Parkison had a cough and clear nasal discharge indicative of an upper respiratory infection were inconsistent with the symptoms Parkison reported to the triage nurse. However, pursuant to the court's ruling on a motion *in limine*, the court instructed the jury that any criticisms of Raja's documentation of symptoms could be considered for credibility purposes only and not as a deviation from the standard of care.

Steigler also opined that Raja deviated from the standard of care by failing to order a CT scan. He stated that the symptoms Parkison reported suggested a subarachnoid hemorrhage or another intracranial problem and a reasonably careful physician would have ordered a CT scan to investigate that possibility. He testified that the "neuro exam" conducted by Raja would not, by itself, detect a subarachnoid hemorrhage. Steigler ultimately concluded to a reasonable degree of medical certainty that Raja deviated from the standard of care by failing to take an adequate medical history and failing to order a CT scan.

On cross-examination, Steigler acknowledged that before his deposition, he had only reviewed Parkison's medical records, the autopsy report prepared by Dr. Young Kim, an incomplete deposition of Dr. Kim, and the depositions of Raja and Parkison's ex-wife. He also acknowledged that vomiting, dizziness, and passing out are not symptoms specific to a subarachnoid hemorrhage, but are present in other illnesses; specifically, an upper respiratory infection.

On cross-examination, Steigler testified that marijuana usage could also cause a person to pass out, although it was rare. Steigler was then presented with Parkison's toxicology report that

accompanied his autopsy report. Steigler stated that he had not previously reviewed that report. He acknowledged that it showed that Parkison had marijuana metabolites in his system at the time of his death. Plaintiff did not object to this testimony at trial. The toxicology report also showed that Parkison had the chemical PPA in his blood stream, which Steigler acknowledged could cause cardiac arrhythmia, heart rhythm disturbances, and elevated blood pressure when taken in toxic amounts.

Plaintiff then called Dr. Colin Bloor, a pathologist, to testify as an expert witness on the cause of Parkison's death. He concluded that Parkison died of a cardiac arrhythmia that was induced by a subarachnoid hemorrhage. He explained that when the subarachnoid space fills with blood, that puts pressure on the brain, which triggers a sympathetic nervous system response, and leads to a fatal cardiac arrhythmia. He stated that subarachnoid hemorrhage is commonly caused by a ruptured aneurysm. He also stated that the autopsy report noted that blood clots were present around the hemorrhage, which indicated to him that the blood had been in that area for one or two days and that the patient was alive when the clotting occurred.

He also testified that Parkison did not die of a heart attack, known as a myocardial infarction. He acknowledged that Parkison suffered from extensive coronary artery disease, but stated that the autopsy provided no indication that Parkison suffered a heart attack. However, he acknowledged on cross-examination that if a patient does not survive a sudden heart attack for at least four hours, there would be no physical indication that a heart attack occurred and, thus, Kim's failure to document changes in the heart did not rule out sudden death by heart attack.

On direct examination, Bloor testified that he rendered his opinions on cause of death with

a reasonable degree of medical certainty, which he later acknowledged to be "95 percent or more true." However, on cross-examination, he admitted that he rendered his opinions with a "degree of medical probability," which is "greater than 51 percent" true. He testified that he could not testify to a reasonable degree of medical certainty because, despite looking for it, Kim found no evidence of a ruptured aneurysm during the autopsy. Bloor also acknowledged that as a pathologist specializing in cardiology, he would not be "called in" if the primary cause of death was a subarachnoid hemorrhage, but he might discover the hemorrhage while examining a patient's cardiac system.

On cross-examination, Bloor testified that if Parkison had a ruptured aneurysm in his brain, he would expect to see a hole in the blood vessel during the autopsy. Bloor acknowledged that Kim did not report any ruptured or unruptured aneurysms in his autopsy report. In forming his opinions, Bloor also considered the fact that Kim testified in his deposition that he did not believe that Parkison had a ruptured aneurysm. Bloor also acknowledged that Kim did not account for the source of the blood he found in Parkison's brain in his autopsy report. Bloor agreed that Kim's report did not indicate the presence of the three signs of a subarachnoid hemorrhage: blood pooled across the back of the brain, herniation, and cerebral edema. Bloor also recognized that Kim did not perform a microscopic evaluation of the heart and, thus, there was no physical evidence to support his theory that a sympathetic nervous system response caused Parkison's arrhythmia.

Dr. Ronald Young testified as an expert in neurosurgery. He testified that the symptoms of a subarachnoid hemorrhage include headache, nausea, vomiting, dizziness, loss of

consciousness, and neurologic symptoms like paralysis and loss of feeling. He opined that Parkison's subarachnoid hemorrhage was caused by a ruptured aneurysm, although he acknowledged that Kim did not report finding one. He believed, based on Parkison's reported symptoms, that Parkison's aneurysm ruptured between one and four days before he reported to the hospital. Young stated that although there are other causes of subarachnoid hemorrhage, there was no evidence to support those other causes.

Young testified that the first step in diagnosing a subarachnoid hemorrhage is performing a CT scan. He stated that a CT scan is in the "90 percent plus range" of accuracy in detecting subarachnoid hemorrhages. In his opinion, a CT scan would have revealed that Parkison had a subarachnoid hemorrhage at the time he was in the emergency room. Young stated that if the hemorrhage had been detected, Parkison would have been admitted to the hospital and undergone an angiogram to determine the source of the bleeding. He determined that had an angiogram been performed, the aneurysm would have been discovered. He then described the process by which an aneurysm is treated to prevent further bleeding. He ultimately opined to a reasonable degree of medical certainty that the failure to perform a CT scan on Parkison caused or contributed to Parkison's death.

On cross-examination, Young acknowledged that Kim likely knew that the leading cause of subarachnoid hemorrhage was an aneurysm. Young admitted that although he was not a pathologist, he did not believe that Kim, the pathologist charged with determining cause of death, looked for a ruptured aneurysm while conducting Parkison's autopsy. Young also admitted that if Parkison did not have an aneurysm prior to his death, then Kim's description of the blood

vessels in Parkison's brain was appropriate.

Jody Yepsen, Parkison's ex-wife, testified that she was with Parkison and their children on the night that Parkison went to the emergency room. She testified that at one point in the evening, she saw Parkison sitting at the table holding his head in his hands. Parkison told her he had a headache, she then called Parkison's doctor, and then took Parkison to the emergency room. Pursuant to defendants' motion *in limine*, the court instructed the jury that it could only consider that testimony as background information to explain why she took Parkison to the emergency room. Yepsen drove Parkison to the emergency and remained in the waiting room for the 20 minutes that Parkison met with Raja. After leaving the hospital, Yepsen drove to a drug store to fill Parkison's prescription and Parkison went home shortly thereafter. She did not see Parkison again until after his death and did not know whether he went to work in the intervening days. Brandon Parkison, the deceased's son, also testified that he and his family went to the emergency room because his father said he had a headache. The court again gave the jury a limiting instruction. Brandon said that he also saw his father holding his head in his hands.

After the close of plaintiff's case, defendants moved for a partial directed verdict on the issue of Raja's failure to take an adequate medical history because neither Bloor nor Young testified that that alleged deviation from the standard of care caused or contributed to Parkison's death. Rather, defendants argued that the causation experts only testified that the failure to order a CT scan caused Parkison's death. Additionally, defendants moved to strike Steigler's testimony that Raja's failure to take an adequate medical history was a deviation from the standard of care. Plaintiff responded that the failure to take an adequate medical history is "part and parcel" of the

failure to order a CT scan. The court took defendants' motion under advisement.

Dr. Nancy Jones, the chief medical examiner in Cook County, testified as defendants' expert forensic pathologist. In her position, she encounters a subarachnoid hemorrhage about once a month while performing autopsies. She testified that after discovering a subarachnoid hemorrhage during an autopsy, a pathologist is trained to first determine the source of the bleeding, which is ordinarily caused by a ruptured aneurysm or trauma.

Jones opined that in this case, the blood and blood clots that Kim reported finding in the subarachnoid space during Parkison's autopsy were postmortem "artifacts," meaning that they were not related to the cause of death but appeared after death as a result of the way that Kim conducted the autopsy. She described that when performing an autopsy, a pathologist removes the brain from the skull and the major organs from the body cavity for examination. If the organs are removed before the skull is opened, then blood in the brain will drain to the empty body cavity by force of gravity. If the skull is opened before the organs are removed, then residual blood in the brain will drain into the back of the skull. Based on Kim's chronological description of Parkison's autopsy, and the photographs of the autopsy, Jones concluded that the blood located in Parkison's skull cavity was an artifact that occurred because Kim opened Parkison's skull before removing his internal organs. She specifically opined that the blood in Parkison's skull cavity was not a subarachnoid hemorrhage caused by a ruptured aneurysm. Furthermore, when Parkison's body was found in his home, he was lying on his back on a heating pad. Jones stated that his elevated body temperature accelerated decomposition, making blood vessels weaker and more likely to leak blood.

Jones also opined that Kim's autopsy report and his deposition indicated to her that Kim looked for an aneurysm, but did not find one, and that if he had found evidence of an aneurysm, he would have indicated that in his report. Jones also opined that Kim's report made no mention of swelling or herniation, which she would expect to see following a subarachnoid hemorrhage.

Jones concluded that the cause of Parkison's death was coronary atherosclerosis, or narrowing of the arteries from plaque or cholesterol, and the mechanism of death was either a myocardial infarction or arrhythmia. There was insufficient evidence to determine which of those mechanisms occurred. However, according to Kim's report, she stated that there was no blood clot in any of Parkison's arteries. She testified that she sees cases like Parkison's about once a week. She agreed that in cases like this, where a myocardial infarction or arrhythmia occurs without a blood clot, the condition is referred to as the "silent killer" because, for the "50 to 75 percent of individuals who have heart disease, their first symptom that they have heart disease is they drop dead." Jones acknowledged that the theory proposed by Bloor and Young – that Parkison suffered an arrhythmia following a sympathetic nervous system response to a ruptured aneurysm – was possible. However, she stated that in this case, there was no evidence in Parkison's medical records indicating that he suffered the extreme degree of pain required to cause a nervous system response that would trigger a fatal arrhythmia.

Dr. Martin Hermann, a neurosurgeon, testified as defendants' causation expert. He testified that, based on Kim's autopsy report, Kim looked for an aneurysm in the appropriate areas of Parkison's brain, but did not find one. He further opined that the blood in Parkison's brain was not a subarachnoid hemorrhage because Kim's report and deposition revealed no

herniation or swelling that typically result from subarachnoid hemorrhage. He concluded that Parkison's death was cardiac related. He further concluded that Bloor's and Young's descriptions of arrhythmia caused by a sympathetic nervous system response were possible, but unlikely. Hermann opined that Parkison's fatal cardiac arrhythmia could have been caused by his ingesting ephedra, which can no longer be sold because of its tendency to cause cardiac arrhythmias. Hermann believed that Parkison was taking ephedra because his toxicology report at autopsy showed he had PPA, an ephedra metabolite, in his system.

Following the close of all evidence, defendants renewed their partial motion for directed verdict on plaintiff's allegation that Raja failed to take an adequate medical history. They argued that plaintiff's experts did not testify that the deviation was a proximate cause of Parkison's death. The court granted defendants' motion. The court then provided instructions to the jury and the only issue of liability was whether Raja's failure to order a CT scan proximately caused Parkison's death. The jury returned a verdict in favor of defendants. Plaintiff filed a posttrial motion, which the court denied. This appeal followed.

## II. ANALYSIS

### A. Forfeiture

Plaintiff asserts several claims of error based on the circuit court's evidentiary rulings. As an initial matter, defendants claim that all of those issues have been forfeited on appeal for various reasons. We will address each of defendants' claims of forfeiture in turn.

A court's evidentiary rulings are unreviewable on appeal if they have not been properly preserved. *Thornton v. Garcini*, 237 Ill. 2d 100, 106 (2009). When the court makes its rulings

before trial pursuant to the parties' motions *in limine*, the rulings are interlocutory and remain subject to reconsideration by the court throughout the trial. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 40 (2010). Consequently, denial of the complaining party's pretrial motion to exclude evidence is not sufficient to preserve the issue for appeal. *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002); *Cetera*, 404 Ill. App. 3d at 40. The complaining party must also make a contemporaneous objection at trial when the evidence is introduced to allow the court the opportunity to revisit its earlier ruling. *Simmons*, 198 Ill. 2d at 569. Failure to object at trial results in forfeiture of the issue on appeal. *Simmons*, 198 Ill. 2d at 569; *Cetera*, 404 Ill. App. 3d at 40.

Additionally, where the court excludes evidence that its proponent sought to introduce, the proponent must make an adequate offer of proof to inform the court, opposing counsel, and the court of review of the basis for the admissibility of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). Absent an adequate offer of proof, the issue is unreviewable on appeal. *Snelson*, 204 Ill. 2d at 23-24. However, where it appears that the circuit court understood the nature and character of the evidence sought to be presented, we may relax the forfeiture rule. *In re Leona W.*, 228 Ill. 2d 439, 461 n.5 (2008).

Here, plaintiff has indeed forfeited the majority of her claims on appeal. She first contends that the court erroneously denied her motion *in limine* to exclude Steigler's testimony concerning Parkison's marijuana use. However, she failed to renew her objection at trial when that testimony was introduced. Therefore, the issue is forfeited. *Simmons*, 198 Ill. 2d at 569.

In reply, plaintiff argues that she was not required to make a "useless in-court objection"

because the court's ruling on the motion *in limine* was so definitive that "she was entitled to conclude that it would continue to make the same ruling," citing *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 165 (2006), in support. However, the *Spyrka* decision was not well reasoned and we decline to follow it.

*Spyrka* concluded that a litigant need not object to the introduction of evidence at trial after an adverse ruling on a motion *in limine* where "the full context of the evidentiary issue develops at trial, such that a motion thereon no longer presents the risk of an erroneous ruling that a pretrial motion *in limine* presents." *Spyrka*, 366 Ill. App. 3d at 165. In such cases, *Spyrka* held, "any ruling on the merits [of the motion *in limine*] is not interlocutory, and the unsuccessful movant need not object further to preserve the issue for review." *Spyrka*, 366 Ill. App. 3d at 165.

However, in reaching that conclusion, *Spyrka* improperly relied on the holding in *McMath v. Katholi*, 304 Ill. App. 3d 369 (1999), *rev'd on other grounds*, 191 Ill. 2d 251 (2000), which was based on an entirely different procedural posture. *McMath* made clear in a section entitled, "Motions *in limine*, Contrasted With Motions To Bar," that although the plaintiff in that case styled her motion as a motion *in limine*, it was actually a motion to bar testimony, made on the last day of trial. *McMath*, 304 Ill. App. 3d at 375-76 (noting that a motion *in limine* is "by definition a *pretrial* motion," and a ruling thereon is interlocutory (emphasis in original)). On the other hand, the court's ruling on the merits of a motion to bar testimony made at trial was not interlocutory in nature, and, therefore, the litigant was not required to object to the introduction of the evidence "within minutes" of the court's ruling to preserve the issue for review. *McMath*, 304 Ill. App. 3d at 377 (stating that any attempt to object to the testimony would have "made no

sense"). Thus, *Spyrka* applied *McMath* for precisely the opposite legal proposition for which it stands. Consequently, we decline to follow *Spyrka* for that proposition of law and reject plaintiff's argument.

Notwithstanding our criticism of *Spyrka*, we also reject plaintiff's argument because *Spyrka* is distinguishable on its facts: the defendant in that case objected to the admission of the contested evidence four times at trial, despite the court's erroneous holding that it was not required to do so. *Spyrka*, 366 Ill. App. 3d at 165. Here, plaintiff failed to make any objection at trial. We can conceive of no reason to excuse plaintiff's failure to object at trial and deem the issue forfeited. *Simmons*, 198 Ill. 2d at 569.

Plaintiff also claims that the court erroneously excluded evidence demonstrating that Raja failed the examination for board certification in internal medicine multiple times. She concedes that evidence of a physician-defendant's failure to obtain board certification credentials is irrelevant and inadmissible where, as here, he testifies only as an occurrence witness and not as an expert. See *Jones v. Rallos*, 384 Ill. App. 3d 73, 90 (2008) (citing *Rockwood v. Singh*, 258 Ill. App. 3d 555, 557-58 (1993)). She does not contend on appeal that the court erred in granting defendants' motion with that limitation in place. Rather, her argument is that Raja's testimony exceeded the limitations imposed by the court and that Raja actually testified as an expert witness because he gave opinions on the standard of care based on his "experience and knowledge." Therefore, she argues, Raja's board-examination failures are relevant and she is entitled to a new trial.

However, plaintiff made no objection at trial when Raja gave the testimony of which she

complains, and she cannot now raise the issue on appeal. *Thornton*, 237 Ill. 2d at 106. Nor did she make any effort to bring to the court's attention the alleged violation of the motion *in limine* or move to strike the offending testimony or seek to introduce evidence of Raja's failed examinations on redirect examination in response to the alleged expansion of his testimony on cross-examination. *Hardy v. Cordero*, 399 Ill. App. 3d 1126, 1134-35 (2010). Therefore, she has forfeited review of this issue as well. *Thornton*, 237 Ill. 2d at 106; *Hardy*, 399 Ill. App. 3d at 1134-35.

Plaintiff's alternative contention – that the legal rule barring evidence of Raja's failure to pass a board-certification examination because he testified as an occurrence witness and not an expert witness is a "bad rule, inimical to justice, productive of unfairness and constitutes an inherent due process deprivation of procedural rights [*sic*]" – was raised for the first time in her posttrial motion and is also forfeited on appeal. See *Thornton*, 237 Ill. 2d at 112.

Plaintiff also argues that she was denied a fair trial because defendants' theory of the case was "unfair." She specifically attacks defendants' closing argument, which, she claims, improperly implied that Parkison's death was an "act of God." That, she claims, violates the decades-old legal rule that any human intervention that contributes to the cause of an injury cannot, by definition, be deemed an act of God, citing *McClean v. Chicago Great Western Ry. Co.*, 3 Ill. App. 2d 235, 246-47 (1954), *Chapman v. Baltimore & Ohio R.R. Co.*, 340 Ill. App. 475, 490 (1950), *Republic Co. of Rockford v. City of Rockford*, 251 Ill. App. 109, 115 (1928), *Mueller Grain Co. v. Chicago, Peoria & St. Louis R.R. Co.*, 200 Ill. App. 347, 350 (1916), and *Quincy Gas & Electric Co. v. Schmitt*, 123 Ill. App. 647, 656 (1906).

Again, this argument is forfeited. Plaintiff failed to object during defendants' closing argument when the allegedly prejudicial remarks were made. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855 (2010). Forfeiture notwithstanding, defendants' argument was properly based on the evidence and did not deprive her of a fair trial.

Counsel is allowed wide latitude in drawing reasonable inferences from the evidence. *Wilbourn*, 398 Ill. App. 3d at 855. Here, defense counsel argued that Parkison died of "an unpredictable and unpreventable tragedy. Cardiac death – sudden cardiac death [ ] happens to hundreds and thousands of people" every year. Jones testified on direct examination that for the "50 to 75 percent of individuals who have heart disease [like Parkison's], their first symptom that they have heart disease is they drop dead," which is why this type of heart disease is known as the "silent killer." Counsel's argument was based directly on Jones's testimony, to which plaintiff also never objected at trial. Thus, plaintiff's argument fails.

### B. Evidentiary Rulings

As to the issues that are preserved for review, none are meritorious. Plaintiff contends that the circuit court erroneously excluded hearsay testimony by Yepsen and Brandon Parkison as to the severity of the headaches Gerald Parkison suffered before he went to the hospital.

Whether to admit or exclude evidence, specifically pursuant to a motion *in limine*, is a decision left to the discretion of the circuit court. *Leona W.*, 228 Ill. 2d at 460. The court's ruling on such motions will not be disturbed on review absent an abuse of that discretion. *Leona W.*, 228 Ill. 2d at 460. "The threshold for finding an abuse of discretion is high." *Leona W.*, 228 Ill. 2d at 460. The court's evidentiary ruling will not be deemed an abuse of discretion unless it may

be said that no reasonable person would take the view adopted by the court. *Leona W.*, 228 Ill. 2d at 460. Moreover, even if an abuse of discretion has occurred, we will not reverse the judgment unless "the record indicates the existence of substantial prejudice affecting the outcome of the trial." *Leona W.*, 228 Ill. 2d at 460.

Although defendants claim that this issue is also forfeited because plaintiff failed to make a formal offer of proof in the hearing on the motions *in limine*, our review of the transcript reveals that the circuit court understood the nature and character of the evidence plaintiff sought to introduce and, thus, we will relax forfeiture here and address the merits. See *Leona W.*, 228 Ill. 2d at 461 n.5.

Defendants' motions *in limine* sought to exclude 36 hearsay statements made by Yepsen at her deposition and 8 hearsay statements made by Brandon at his deposition. The court ruled on the admissibility of each statement. Plaintiff does not identify in her brief the specific statements she claims were erroneously excluded. However, after reviewing the motions, it appears that she is arguing that Yepsen could have testified that "Gerald complained that his head, back and neck hurt, that light hurt his eyes, and [that he] requested she rub his neck" and that Brandon could have testified that "Gerald said that he had a headache and his muscles hurt."

There is no dispute that the barred testimony consists of hearsay statements, which are out-of-court statements offered to prove the truth of the matter asserted, and that such statements are generally inadmissible unless they fall within an exception to the hearsay rule. *People v. Cloutier*, 178 Ill. 2d 141, 154-55 (1997). Plaintiff argues that the family members' testimony was admissible as an exception to the hearsay rule because it was evidence of Parkison's state of mind

before going to the hospital.[1]  Specifically, she argues that the barred testimony about the intensity

of the headaches Parkison suffered before going to the hospital was "an important indicator of a

subarachnoid hemorrhage."  That, she claims, would have supported her theory that Parkison was

suffering from an undiagnosed aneurysm at the time he reported to the hosptial.

Plaintiff relies on *People v. Floyd*, 103 Ill. 2d 541, 546 (1984), to support her argument

that evidence of the declarant's state of mind is admissible as an exception to the hearsay rule if

(1) the declarant is unavailable to testify, and (2) there is a reasonable probability that the

proffered hearsay statements are reliable.  *Floyd*, 103 Ill. 2d at 546.  However, conspicuous by its

absence is any discussion by the plaintiff of the third requirement for admission of state-of-mind

testimony under *Floyd*: the declarant's state of mind must be relevant to a material issue in the

case.  *Floyd*, 103 Ill. 2d at 546.

We must first address an apparent discrepancy in the presentation of the third element of

this rule.  Some recent cases state that the rule requires the "statement" to be relevant for

admissibility.  See *People v. Caffey*, 205 Ill. 2d 52, 88 (2001); *Serrano v. Rotman*, No. 1-09-

2028, 2011 WL 477695, at *10 (Ill. App. Feb. 4, 2011); *People v. Munoz*, 398 Ill. App. 3d 455,

479 (2010); *People v. Dunmore,* 389 Ill. App. 3d 1095, 1107 (2009).  However, *Floyd*, on which

plaintiff and those cases rely, more precisely states the rule as requiring the declarant's "state of

mind" to be relevant.  We wish to clarify that the rule does not require the substantive content of

---

[1]Although plaintiff argues that the testimony is admissible under Rules 803(3) and 803(4)
of the Federal Rules of Evidence, at the time of this trial, Illinois abided by the common law rules
of evidence pertaining to the state-of-mind exception.

the statement to be relevant for admissibility; such an interpretation would contravene the purpose of the hearsay rule. See *Munoz*, 398 Ill. App. 3d at 481; Michael H. Graham, Graham's Handbook of Illinois Evidence §801.5 (10th ed. 2010). Rather, the aforementioned cases' reference to the relevance of the "statement" must refer to the fact that when an out-of-court statement is used to demonstrate the declarant's state of mind, that statement is no longer considered hearsay because it is not used for its substantive content. *Dunmore*, 389 Ill. App. 3d at 1106; Graham, *supra*. The courts in the aforementioned cases properly applied the rule to the relevance of the declarant's state of mind, according to *Floyd*. *Serrano*, 2011 WL 477695, at *11; *Munoz*, 398 Ill. App. 3d at 481; *Dunmore,* 389 Ill. App. 3d at 1107.

Here, plaintiff fails to make any argument as to how Parkison's state of mind before he went to the hospital is relevant to any material issue in this case. Rather, on appeal, she argues the relevance of the content of the hearsay statement, which makes clear that she misapprehends the operation of the state-of-mind exception. That is, she contends that the barred testimony contains Parkison's account that he suffered severe headaches, which proves that he suffered severe headaches – that being "an important indicator of a subarachnoid hemorrhage" and proof that he was suffering from an undiagnosed aneurysm when he went to the hospital. Put another way, plaintiff sought to use the content of the hearsay statement to prove its truth, which is precisely what the hearsay rule seeks to prevent. *Munoz*, 398 Ill. App. 3d at 482. A hearsay statement admitted under the state-of-mind exception may only be used for the limited purpose permitted by the exception, not for its own truth. *Munoz*, 398 Ill. App. 3d at 481 (citing *People v. Caffey*, 205 Ill. 2d 52, 89-90 (2001)). Thus, Yepsen's testimony could never be used for the

purpose that plaintiff now claims on appeal and her argument fails. *Munoz*, 398 Ill. App. 3d at 481 (citing *Caffey*, 205 Ill. 2d at 89-90). The court recognized plaintiff's misapplication of the rule and barred the testimony. We cannot say that no reasonable person would have taken that view and, thus, it was not an abuse of discretion. *Cetera*, 404 Ill. App. 3d at 36-37.

Plaintiff next attacks a "constellation of orders" implicating Raja's alleged deviation from the standard of care in failing to accurately chart Parkison's symptoms and, in turn, failing to instruct the jury on that deviation. It is first necessary to identify exactly what the parties argued below and how the court ruled. Defendants filed their motion *in limine* number 33,[2] seeking to prevent Steigler from testifying that Raja failed to accurately chart Parkison's symptoms; specifically, that Raja failed to properly document Parkison's symptoms on his medical chart. The court granted defendants' motion on the ground that it was irrelevant, given that none of plaintiff's experts would testify that charting deficiencies caused Parkison's death. The court also rejected plaintiff's tendered jury instruction that included the charting deficiencies as a proximate cause of Parkison's death.

Steigler separately opined that Raja deviated from the standard of care by not taking an adequate medical history; specifically, Raja did not properly follow up with Parkison on his reported symptoms of vomiting, nausea, and fainting during the examination. Steigler testified to that deviation from the standard of care at trial. However, defendants moved for a directed

---

[2] Plaintiff argues that the issue also involves defendants' motion *in limine* number 31, but that motion pertains to the admissibility of medical literature that postdates Parkison's hospital visit, which is not implicated here.

verdict on this issue after the close of all evidence, arguing that none of plaintiff's experts testified that the failure to take an adequate medical history caused Parkison's death, and the court granted defendants' motion.

Additionally, Steigler opined that Raja deviated from the standard of care by failing to order a CT scan. Steigler rendered that opinion at trial as well. Young provided expert testimony to support the allegation that Raja's failure to order a CT scan proximately caused Parkison's death and that issue was presented to the jury, which ultimately rendered its verdict in favor of defendants.

As to the court's ruling on defendants' motion *in limine* number 33, we conclude that the court properly exercised its discretion in excluding Steigler's testimony on charting deficiencies as irrelevant. "Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable." *In re A.W.*, 231 Ill. 2d 241, 256 (2008). In a medical negligence case, the plaintiff must prove: (1) the standard of care by which the physician's treatment is measured, (2) that the physician deviated from the standard of care, and (3) that the deviation proximately caused injury to the plaintiff. *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 843 (2010). To establish proximate cause, the plaintiff must provide expert testimony to a reasonable degree of medical certainty that the deviation caused his injury, and the causal connection must not be " 'contingent, speculative, or merely possible.' [Citation.] " *Johnson*, 402 Ill. App. 3d at 843.

Here, plaintiff's counsel admitted at the hearing on the motion *in limine* that "[t]here is no testimony that a failure to chart anything caused [Parkison's] death." Thus, the court was well

within its discretion to conclude that the testimony was irrelevant in proving negligence absent testimony that the alleged deviation proximately caused Parkison's death. See *Snelson*, 204 Ill. 2d at 46; *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 15-16 (1999). Furthermore, absent evidence of proximate cause, the court properly rejected plaintiff's tendered jury instruction, which included the alleged charting deficiency as a proximate cause of death. *Beard v. Barron*, 379 Ill. App. 3d 1, 19 (2008) (holding that the circuit court properly rejects a tendered jury instruction where there is no evidence to support it); see also *Serrano*, 2011 WL 477695, at *8.

On appeal, plaintiff suggests that Raja's charting deficiencies are synonymous with his failure to take an adequate medical history and, thus, the charting deficiencies "were a precipitating cause of the failure to order the necessary CT scan." We find that argument disingenuous. The court and the parties treated those claims as separate deviations in the court below and their experts testified as such. Notably, not one of plaintiff's experts equated charting deficiencies with a failure to take an adequate medical history. Thus, we reject her attempt to commingle those issues here.

To the extent that plaintiff is challenging the court's directed verdict on Raja's failure to take an adequate medical history, we affirm the court's ruling on that issue as well. A directed verdict is proper where all of the evidence, viewed in the light most favorable to the nonmoving party, " 'so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100 (2010) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). Where the circuit court finds that the

plaintiff failed to present evidence on every element of the cause of action, our review is *de novo*. *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52-53 (2010).

In the court below, Raja's alleged failure to take an adequate medical history was offered by plaintiff as a distinct basis for Raja's alleged negligence. Our review of the record reveals that plaintiff failed to provide expert testimony to support her claim that the failure to take an adequate medical history proximately caused Parkison's death. A verdict for plaintiff on that issue could never stand absent such evidence, and, thus, the directed verdict was proper. See *Lazenby*, 236 Ill. 2d at 100.

Again, plaintiff appears to argue on appeal that Steigler's testimony that Raja failed to order a CT scan encompasses Raja's failure to take an adequate medical history; therefore, Young's testimony that the former deviation was the proximate cause of death applies equally to the latter deviation. Even if she had not improperly bootstrapped this argument, an expert's "implied" testimony – in plaintiff's words – about the deviation from the standard of care is insufficient to satisfy plaintiff's burden to present expert testimony "to a reasonable degree of medical certainty that the deviation caused [Parkison's] injury," without being " 'contingent, speculative, or merely possible.' [Citation.] " *Johnson*, 402 Ill. App. 3d at 843. Therefore, her argument fails.

In light of the fact that we have rejected all of plaintiff's claims of error, we also reject her argument that the court's rulings, *in toto*, require reversal. *Caffey*, 205 Ill. 2d at 118.

## C. Manifest Weight of the Evidence

Finally, plaintiff argues that the jury's verdict was against the manifest weight of the

evidence. Specifically, she contends that Raja's version of events was contradicted by other evidence, making it "of virtually no value."

It is well established that in reviewing a jury verdict, this court "may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson*, 204 Ill. 2d at 35. Rather, we may only reverse a jury's verdict if it is contrary to the manifest weight of the evidence. *Snelson*, 204 Ill. 2d at 35. A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident, or if the jury's findings are unreasonable, arbitrary, or not based on the evidence. *Snelson*, 204 Ill. 2d at 35.

Here, relying largely on the autopsy report prepared by Kim, plaintiff's experts opined that Parkison suffered a fatal arrhythmia triggered by a sympathetic nervous system response to a subarachnoid hemorrhage, which was caused by a ruptured aneurysm. Moreover, they concluded that Raja's failure to order a CT scan for Parkison when he appeared at Ingalls's emergency room was a proximate cause of his demise because the CT scan would have detected the subarachnoid hemorrhage and led to proper treatment. Defendants' experts interpretation of the autopsy report led them to conclude that the subarachnoid hemorrhage was an artifact of the order in which Kim performed the autopsy, not the result of an undetected ruptured aneurysm. Defendants' experts opined that Parkison suffered a myocardial infarction or arrhythmia caused by atherosclerosis.

This case is a " 'classic battle of the experts,' " where well-qualified experts in their respective fields of expertise gave their opinions on the issues and provided reasons therefor. *Snelson*, 204 Ill. 2d at 36 (quoting *Snelson v. Kamm*, 319 Ill. App. 3d 116, 145 (2001)). The jury weighed the conflicting evidence, including any discrepancies in Raja's testimony, and made a

determination as to which parties' witnesses were more credible. Ultimately, the jury believed defendants' experts, not plaintiff's, and rendered its verdict for defendants. We will not substitute our judgment for the jury's when the evidence "did not greatly preponderate either way." (Internal quotation marks omitted.) *Snelson*, 204 Ill. 2d at 36 (quoting *Snelson v. Kamm*, 319 Ill. App. 3d at 145). The verdict was not against the manifest weight of the evidence.

### III. CONCLUSION

Accordingly, we conclude that plaintiff forfeited review of several evidentiary rulings and her claim that defendants' closing argument was "unfair." Of those evidentiary matters that were properly preserved, we find that the circuit court did not abuse its discretion in making its rulings. Finally, we conclude that the jury's verdict was not against the manifest weight of the evidence. For all of these reasons, we affirm the judgment of the circuit court.

Affirmed.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
_____

HEATHER GUSKI, Independent Administrator of the Estate of
Gerald Parkison, Deceased,

   Plaintiff-Appellant,

      v.

ASIM RAJA and MIDWEST EMERGENCY ASSOCIATES,

   Defendants-Appellees

(Ingalls Memorial Hospital,

   Defendant).
_____

No. 1-10-0108

Appellate Court of Illinois
First District, Second Division

Filed: May 10, 2011
_____

JUSTICE CONNORS delivered the opinion of the court.

Cunningham, P.J., and Harris, J., concur.
_____

Appeal from the Circuit Court of Cook County
Honorable Daniel M. Locallo, Judge Presiding
_____

For PLAINTIFF-        Robert A. Strelecky
APPELLANT:            Sean P. Driscoll
                      Clifford Law Offices
                      120 N. LaSalle St., 31st Floor
                      Chicago, Illinois 60602

For DEFENDANTS-       James K. Horstman
APPELLEES:            Rodney E. VanAusdal
                      Melissa H. Dakich
                      Cray Huber Horstman Heil & VanAusdal LLC
                      303 W. Madison St., Suite 2200
                      Chicago, Illinois  60661