# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Buck v. Charletta*, 2013 IL App (1st) 122144

---

| | |
|---|---|
| Appellate Court Caption | DAVID BUCK, Individually and as Independent Administrator of the Estate of Pauline Buck, Deceased, Plaintiff-Appellant, v. DALE A. CHARLETTA, M.D., and DAC IMAGINGS, S.C., Defendants-Appellees. |
| District & No. | First District, Fourth Division <br> Docket No. 1-12-2144 |
| Filed <br> Rehearing denied | June 27, 2013 <br> July 31, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a medical malpractice action alleging that defendants caused the death of plaintiff's wife by failing to properly report a magnetic resonance imaging scan indicating that she had lung cancer, summary judgment was improperly entered for defendants, since a jury should have been permitted to decide whether a communication failure occurred with regard to the scan that resulted in decedent being delayed one year in obtaining treatment. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-11382; the Hon. Drella Savage, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Phillip J. Ryan, of Ryan, Ryan & Landa, of Waukegan, for appellant.

Timothy A. Waver and Michael A. Barry, both of Pretzel & Stouffer, Chtrd., of Chicago, for appellees.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Epstein concurred in the judgment, and opinion.

**OPINION**

¶ 1 This is an appeal from the circuit court's order granting summary judgment in favor of the defendants, Dr. Dale A. Charletta (hereinafter Dr. Charletta) and DAC Imagings, S.C. (hereinafter DAC), in a survival act and wrongful death action brought on behalf of Pauline Buck (hereinafter Pauline) individually, and on behalf of her estate, by the plaintiff, her husband, David Buck (hereinafter David). The plaintiff asserts that the circuit court incorrectly ruled that there were no genuine issues of material fact as to whether Dr. Charletta and DAC proximately caused Pauline's death. For the reasons that follow, we reverse and remand.

¶ 2 I. BACKGROUND

¶ 3 The record below is voluminous. For purposes of brevity we set forth only the pertinent facts and procedural history. The parties agree that on October 4, 2006, then 49-year-old Pauline consulted an orthopedic surgeon, Dr. Daniel Troy (hereinafter Dr. Troy) at Midwest Orthopaedics (hereinafter Midwest), complaining of neck pain. Dr. Troy ordered an X-ray[1] and a magnetic resonance imaging scan (hereinafter MRI) of Pauline's cervical spine. Pauline herself was a trained oncological nurse. After the X-ray and MRI were performed at Midwest, they were sent to radiologist Dr. Charletta at DAC for interpretation. DAC was the exclusive provider of interpretive radiology services to Dr. Troy and Midwest. Dr. Charletta prepared and approved a final MRI report (hereinafter the report), which detailed an abnormal finding in Pauline's right lung, including a possible malignant lung tumor. The report recommended that follow-up chest radiographs be taken and that a correlation with the original X-ray be performed. The medical records indicate that no such follow-ups were done and Pauline's tumor went undiagnosed. Approximately one year later, Pauline was seen

---

[1]The parties agree that it was Mark Bordick, Dr. Troy's physician's assistant, who ordered the X-ray on behalf of Dr. Troy.

by a doctor for an evaluation of neck pain. He ordered a radiological study, which also disclosed the incidental finding of a tumor in her lung. This radiologist communicated the clinically significant information back to the ordering physician within a matter of hours and the patient immediately began a course of treatment for lung cancer, which was unfortunately unsuccessful.

¶ 4       On October 14, 2008, the plaintiff filed a complaint alleging medical malpractice against Dr. Troy, Midwest, Dr. Charletta and DAC. The complaint specifically alleged that Dr. Charletta was negligent in the manner in which he reported his interpretation of Pauline's MRI to Dr. Troy.[2] According to the complaint, Dr. Charletta was required to make a "non-routine, real-time communication" to Dr. Troy to alert him to the clinical significance of the abnormal findings in his report. The complaint also alleged that Dr. Troy failed to inform Pauline of those abnormal findings, and that as a result Pauline's tumor went undiagnosed and untreated.[3]

¶ 5       On May 26, 2009, Pauline died from lung cancer. Pauline's husband David then petitioned the court to be appointed as the special representative of Pauline's estate and to be permitted to substitute himself as the party plaintiff instead of Pauline. On June 18, 2009, pursuant to section 2-1008(b)(1) of the Code of Civil Procedure (735 ILCS 5/2-1008(b)(1) (West 2008)), the circuit court granted David's petition. On August 10, 2009, David amended his complaint to include an additional wrongful death count against Dr. Charletta and DAC.

¶ 6                               A. Deposition Testimony

¶ 7       The parties proceeded with discovery, and numerous witnesses were deposed, including, relevant to this appeal: (1) Dr. Charletta; (2) Dr. Troy; (3) Michael E. Schrader; (4) Danielle Hesse; (5) Pauline; (6) Mark F. Bordick; and (7) Dr. David Markovitz.

¶ 8                               1. Dr. Charletta

¶ 9       Dr. Charletta testified in his deposition that he is a radiologist and the owner of DAC. He contracts with other healthcare providers, such as Midwest, to read and interpret MRIs. According to Dr. Charletta, in October 2006, Midwest was using a computer system to transfer images to him for review and interpretation. Patients would undergo MRI imaging studies at Midwest's facility and the staff at Midwest would upload the images onto a server, owned by Dr. Charletta, but physically located in Midwest's office. Dr. Charletta would remotely log onto the server over the Internet, view the images, interpret them, and dictate a report. He would then have the report transcribed and uploaded into the server. After

---

[2]With respect to DAC, the complaint alleged that the corporation was responsible under the doctrine of *respondeat superior* for Dr. Charletta's negligence.

[3]We note that although Dr. Troy was originally named as a defendant in this cause of action, he reached a settlement with Pauline and David on March 27, 2009. The cause then proceeded exclusively against Dr. Charletta and DAC.

proofreading and finalizing the report, Dr. Charletta would electronically make the report available to the staff at Midwest. The report and images would then remain available on the server at Midwest.

¶ 10    Dr. Charletta testified that on October 6, 2006, Midwest uploaded an MRI scan with images of Pauline's cervical spine onto his server and requested that Dr. Charletta interpret them. To assist in his interpretation of the MRI images, Dr. Charletta viewed online, using a separate web server owned and operated by Midwest, an image from the October 4, 2006, AP cervical X-ray of Pauline's spine taken at Midwest. Using this image of the AP cervical spine,[4] Dr. Charletta observed a poorly defined density in Pauline's right upper lung. On October 9, 2006, he prepared his final report and uploaded it in electronic form onto his server located at Midwest. The first paragraph of that report, titled "OBSERVATIONS," states in relevant part:

"The AP cervical spine film demonstrates a poorly defined density in the apical segment of the right upper lung lobe. This finding is nonspecific but raises the possibility of a lung mass. Follow-up dedicated two view chest radiographs are recommended as the first step in further evaluation. The mass cannot be measured since this feature is not supported by the Stryker web server software. Correlation with original cervical spine radiographs is recommended as well."

The second page of Dr. Charletta's report contains a section titled "IMPRESSIONS" and further notes:

"It is noted at [*sic*] the AP cervical spine digitized radiograph demonstrates a poorly defined density in the upper lung lobe. Correlation with original radiograph is recommended. This may represent a lung infiltrate, fibrosis or even a lung tumor, even malignant. I would recommend follow up two view chest radiographs as a first-step in further evaluation."

The report identifies Dr. Troy as the referring physician.

¶ 11    In his deposition, Dr. Charletta admitted that he had no personal communication with Dr. Troy regarding Pauline's MRI. Dr. Charletta never faxed his report to Dr. Troy, nor did he call Dr. Troy to inform him of his findings.


¶ 12                              2. Dr. Troy

¶ 13    In his deposition, Dr. Troy testified that he is an orthopedic surgeon and that he first treated Pauline in August 2004. Specifically, on August 13, 2004, he performed a discectomy[5] on Pauline. Dr. Troy did not have occasion to see Pauline again until October 2006. Specifically, on October 2, 2006, Pauline contacted Dr. Troy's office complaining of

---

[4]During his deposition, Dr. Charletta explained that the image of the AP cervical spine that he used in his interpretation was a digitized nondiagnostic image because at that time Midwest did not have the ability to send diagnostic-quality images.

[5]A discectomy is the surgical removal of herniated disc material that presses on a nerve root or the spinal cord.

a new injury to her spine. During her appointment at Midwest, on October 4, 2006, Pauline was first seen by Dr. Troy's physician's assistant, Mark F. Bordick, who ordered an X-ray of her spine. After examining that X-ray, Dr. Troy noted joint damage in Pauline's spine and ordered an MRI to "show the history of a prior fusion" and "to evaluate for any type of recurrent cervical stenosis above or below the fusion level." Dr. Troy admitted that, at that time, he did not note any abnormality in Pauline's lung and stated that he did not order the MRI for the purpose of any diagnosis with respect to her lung. After the MRI was performed, Dr. Troy sent it to Dr. Charletta for interpretation.

¶ 14     Dr. Troy testified that he ordinarily received Dr. Charletta's reports from the medical assistants at Midwest. He acknowledged, however, that on occasion, Dr. Charletta would personally telephone him to discuss MRIs. According to Dr. Troy, however, Dr. Charletta did so only when there were unexpected findings with potentially serious consequences for the patient. He explained that a telephone call would be occasioned only by "something where there's no argument over whether it could or could not be definitive." Dr. Troy estimated that Dr. Charletta had such occasion to telephone him no more than 5 to 10 times. He could recall only two specific circumstances: (1) when there was " a tumor in the middle of the spinal cord that was unequivocal"; and (2) when there was a "soft tissue tumor of a thigh that was unequivocal."

¶ 15     Dr. Troy testified that he first saw and reviewed Dr. Charletta's report concerning Pauline's MRI on October 11, 2006. Dr. Troy averred that he considered Dr. Charletta's reference to a lung mass in Pauline's chest clinically significant. As a result, when he met with Pauline on October 11, 2006, he spoke to her about the potential problem with her lung and then read Dr. Charletta's full report to her. Dr. Troy testified:

> "I informed Pauline that the MRI report, as I read the overall impression number 3, that it could represent a lung infiltrate, fibrosis or even a lung tumor. She, at that point in time, informed me that she had a long history of bronchitis and there was nothing to worry about that she was going to follow-up with her primary care doctor on this."

Dr. Troy admitted that he did not give Pauline a copy of Dr. Charletta's report but stated that it was his understanding that his medical assistant, Danielle Hesse, gave Pauline a copy. He did not, however, personally see Hesse hand a copy to Pauline.

¶ 16     Dr. Troy admitted that he never personally communicated the findings in Dr. Charletta's report to Pauline's primary physician and that he never faxed the report to him. He also admitted that there is no mention in Pauline's chart or medical records from Midwest that he read the report to her, even though with "99.9% of [his] other patients [he] would have made a record in their chart that [he] had read to them the MRI findings, impressions and the observations." Dr. Troy also admitted that although Midwest had its own diagnostic imaging center, and therefore the ability to order follow-up chest X-rays for Pauline on October 11, 2006, he never did so.

¶ 17     Dr. Troy explained, however, that he treated Pauline differently from his other patients because she was an oncology nurse. As the transcript of Dr. Troy's deposition reveals:

> "A. In hindsight I wish I–I wish I didn't treat her as an oncology nurse. I wish I treated her as a patient. And if I did that and if I did what I usually do for 99.9% of my

patients, she may have gotten treatment sooner.

Q. I missed the last–

A. She may have had treatment sooner instead of just telling her.

Q. Could you tell me what you did different with Pauline than you would have done with 99.9% of your patients?

A. I would have called her primary care doctor. I would have faxed the results over. I would have assumed that she wasn't going to follow-up. I would have assumed, as most smokers do for themselves, that 'it's not going to be me' attitude, and I would have treated her differently.

Q. What else would you have done differently?

A. I would have made sure that I talked to her primary care doctor directly rather than talking to her and making an assumption."

¶ 18    Dr. Troy further averred that he saw Pauline again on November 15, 2006, for a checkup regarding her spine. He testified that, on that day, he again reviewed Dr. Charletta's full report with Pauline. Dr. Troy verified his handwritten initials and the date "11/15/06" on the report.

¶ 19    Dr. Troy acknowledged that his initials are located at the top of the report, directly across from the caption section, which includes, *inter alia*, the patient's and the referring physician's names, the age and sex of the patient, the date the MRI report was completed, the reason for the interpretation request, and a rubric indicating whether the MRI is "normal." Dr. Troy admitted that next to the rubric "normal" Dr. Charletta had written "yes." Dr. Troy further acknowledged that although he typically initials that area of a report that he discusses with his patients, in the instant case, his initials are not at the end of the report next to the "IMPRESSIONS" section where Dr. Charletta noted the abnormal findings in Pauline's lung and recommended that she undergo additional chest X-rays. Rather, Dr. Troy recognized that his initials are next to the caption section that states that the MRI is "normal."[6] Dr. Troy testified, however, that to the best of his recollection he reviewed the full report with Pauline, and after he did so, "[h]e was assured *** that she either had followed up or was going to follow-up with her primary care doctor."

¶ 20    Dr. Troy treated Pauline for the last time in February 2007 and prescribed a cortisone shot for an impinged nerve. At that time, he did not discuss Dr. Charletta's report with her.

---

[6]The record reveals, however, that the body of the first page of Dr. Charletta's report, on top of which Dr. Troy placed his initials, begins with a section titled "OBSERVATIONS," which also speaks of the mass in Pauline's lung, stating:

"The AP cervical spine film demonstrates a poorly defined density in the apical segment of the right upper lung lobe. This finding is nonspecific but raises the possibility of a lung mass. Follow-up dedicated two view chest radiographs are recommended as the first step in further evaluation. The mass cannot be measured since this feature is not supported by the Stryker web server software. Correlation with original cervical spine radiographs is recommended as well."

¶ 21 Dr. Troy next testified that his understanding of Dr. Charletta's report would not have been different had Dr. Charletta followed up by faxing the report or telephoning to personally communicate the findings in that report to him. As the transcript of the deposition reveals:

"Q. If Dr. Charletta had placed a telephone call and discussed with you on, say, October 11, 2006, what he wrote in his report, would your management of that issue have been the same as what you actually did do?

A. It would.

Q. Did you have any expectation that Dr. Charletta would telephone you with comments about what might have been seen on a digitized film that was not of diagnostic quality as an unexpected finding?

A. No, I think the MRI served the same purpose, the results."

### 3. Michael E. Schrader

¶ 23 In his deposition, Michael E. Schrader (hereinafter Schrader), a licensed practical nurse, testified that in 2006 he worked as a triage nurse at Midwest. He testified that Midwest's triage station had a fax machine and that nurses at that station would use the fax machine to receive lab reports, X-rays, and other relevant reports from other facilities. He could not recall how MRI reports were received, but believed that the medical records office was responsible for receiving them and placing them in the patients' charts. He could not state with certainty but believed that the medical records office received MRI reports by fax.

¶ 24 Schrader explained that Midwest has a new protocol, which articulates how MRI reports are to be received by treating physicians. That protocol, which was not in place in 2006, now requires that a formal stamp be placed on each MRI report to certify that the patient has been contacted with the results of the MRI and that he or she has made a follow-up appointment with a treating surgeon.

¶ 25 According to Schrader, although in 2006, some physicians used stamps to verify receipt of MRI reports, Dr. Troy did not.

¶ 26 During his deposition, Schrader was next questioned about Pauline. Although he could not remember Pauline or any of her appointments, Schrader identified his initials and notations on Dr. Charletta's report, including the receipt date of the report ("10/10/06") and the follow-up appointment scheduled ("appt. 10/11/06"). He could not recall, however, how the report came into his possession and has no memory of what he subsequently did with it.

### 4. Danielle Hesse

¶ 28 In her deposition, Danielle Hesse (hereinafter Hesse) testified that in 2006 she was one of eight or nine medical assistants assigned to work with Dr. Troy at Midwest. Among other things, prior to each day's appointments, Hesse was responsible for collecting patients' charts and placing them in front of the exam room doors for the physicians.

¶ 29 Hesse assisted Dr. Troy on October 11, 2006. After "pulling" Pauline's chart, she noted that Pauline was a nurse. Hesse also noted Dr. Charletta's MRI report, flagged it and physically placed it outside and in front of Pauline's chart for Dr. Troy to see. Hesse testified

that as she did so, she read Dr. Charletta's report and became upset when she read the word "malignancy." When Dr. Troy arrived, Pauline was crying. Dr. Troy inquired why she was upset, and Hesse explained that Pauline reminded her of her mother-in-law because she was coming in to Midwest to go over the results of her MRI, which contained "some abnormal findings." Hesse testified that she then watched Dr. Troy read the report outside of Pauline's examination room.

¶ 30    Hesse then accompanied Dr. Troy into the exam room and was present when Dr. Troy informed Pauline of the abnormality in her right lung. She testified consistently with Dr. Troy's testimony regarding his conversation with Pauline. Hesse averred that at the end of the appointment, pursuant to Dr. Troy's instructions, she made a photocopy of Dr. Charletta's report and gave it to Pauline. Both she and Dr. Troy then made a point of reminding Pauline to follow up with her primary care physician and give him the report.

¶ 31    Hesse explained that she has a vivid memory of Pauline because one month before Pauline's October 11, 2006, office visit, Hesse's mother-in-law had a very similar experience in the same examination room at Midwest with Dr. Troy. Dr. Troy ordered an X-ray of Hesse's mother-in-law's spine, noted lesions on the X-ray and ordered an MRI. After Dr. Charletta interpreted the MRI, Hesse's mother-in-law was sent to a hospital for pain treatment and follow-up testing and a cancer was detected.

¶ 32    During her deposition, Hesse was next asked to identify a note she had drafted on October 1, 2008, in anticipation of the lawsuit against Dr. Troy. Therein she wrote, *inter alia*:

"After clinic was done Dr. Troy was in a closed door meeting with our Zimmer rep Kevin Worth. Dr. Troy received a phone call from our lawyers Mike (I can't think of his last name), and I came into the exam room and told Dr. Troy to take the phone call. About five or ten minutes later I was called into the room to speak to the lawyer Mike on the phone regarding a patient by the name of Pauline Buck back from October of '06. He asked me specific questions in regards to the office visit that day. I do remember the conversation Dr. Troy had had with her regarding her MRI results of her cervical spine. There was as [*sic*] abnormal finding in her MRI. I specifically remember this because I was going through a difficult time with my mother-in-law who was diagnosed with cancer two months prior to this, and it was a very emotional time for me. I saw the results of the MRI before Dr. Troy had gone into the room. I read them over with Dr. Troy before going into the exam room with the patient. I remember Dr. Troy going over the results with her and telling her that she needs to definitely follow-up with her primary care doctor. He did tell her that it could be nothing, or it could be something. He didn't get into details as far as bad things, or anything, but just told her she absolutely positively had to follow-up with her primary care doctor, as he does with every single patient that he sees. He goes into great detail about the whole entire MRI no matter what the findings [are]."

¶ 33    On cross-examination, Hesse admitted that she and Dr. Troy are very close; so close, in fact, that their colleagues have commented that they are "like a married couple."

¶ 34                                    5. Pauline

¶ 35        In her evidence deposition, preserved in video format prior to her death, Pauline testified that she worked as a pediatric oncology nurse for over 15 years. Pauline averred that after her MRI was taken at Midwest, she followed up with Dr. Troy on October 11, 2006, and that he continued to treat her for back and neck pain until August 1, 2007. Pauline testified that during this time, neither Dr. Troy nor anyone at Midwest ever told her about the possible malignancy in her right lung that Dr. Charletta identified in his MRI report. No one ever referred Pauline to an oncologist or advised her to have additional chest X-rays taken. Pauline explained that as a former pediatric oncology nurse she was familiar with the meaning of the terms "lung mass," "lung tumor" and "malignant lung tumor," and that she equated those words with death. She averred that had Dr. Troy told her to get additional chest radiographs taken because of a possible lung mass or malignant tumor, she would have done so immediately.

¶ 36        During her deposition, Pauline also admitted that she has "a 30-year history of smoking" and that sometime in the 1990s she was diagnosed with chronic obstructive pulmonary disease (COPD).


¶ 37                                 6. Mark F. Bordick

¶ 38        In his deposition, Mark F. Bordick (hereinafter Bordick) testified that he is a certified physician's assistant at Midwest and that in 2006 he often worked with Dr. Troy. Bordick testified that in 2006 he averaged about 40 to 45 patients a day while Dr. Troy averaged about 55 to 60. Bordick did not know how MRIs were received by Midwest in 2006, but stated that to the best of his knowledge they all "first went through the nurse triage desk where they were received via fax."

¶ 39        Bordick stated that when he was first contacted by attorneys in this matter, he could not recall treating Pauline. He explained, however, that he had known of Pauline from his wife because the two had worked together as nurses in another hospital.

¶ 40        Bordick stated that he personally reviewed all of Midwest's medical records and found no evidence that Pauline was told that Dr. Charletta's report identified a density in her right lung or that she should get a chest X-ray. Bordick found nothing in Midwest's records that would affirmatively show that Dr. Troy ever read the report, read the report to Pauline, or gave her a copy of it.


¶ 41                                7. Dr. David Markovitz

¶ 42        In his deposition, neurologist Dr. David Markovitz (hereinafter Dr. Markovitz) testified that in October 2007, Pauline was referred to him by her primary care physician because of numbness and a tingling sensation in her neck. Dr. Markovitz ordered an MRI of Pauline's cervical spine. The MRI was sent to an interpreting radiologist, Dr. Katie Dumford, who noted an abnormality that appeared to be a lesion in the right upper lung. On October 17, 2007, Dumford faxed the MRI results to Dr. Markovitz twice within a span of about three hours. Dr. Markovitz could not recall whether Dr. Dumford also telephoned him, but stated

that it would not have been unusual "given the findings." Dr. Markovitz read the MRI report, informed Pauline of its findings and ordered a chest X-ray. That X-ray confirmed the presence of the abnormality and tumor.

¶ 43                              B. Expert Witnesses' Affidavits

¶ 44    During discovery, pursuant to Supreme Court Rule 213(f)(3) (Ill. S. Ct. R. 213(f)(3) (eff. Jan.1, 2007)), the plaintiff disclosed affidavits of several expert witnesses that he anticipated calling at trial, including: (1) Arthur Schorr; (2) Stephen Gerzof, M.D.; and (3) Carol Westbrook, M.D.

¶ 45    In his affidavit, Arthur Schorr (hereinafter Schorr), an expert health care consultant, specializing in the field of medical record-keeping, opined that Dr. Charletta did not effectively communicate the information contained in his MRI report to Dr. Troy. According to Schorr, the fact that Midwest's medical records contain no mention of Dr. Troy telling Pauline about the report "confirm[s]" that the pulmonary findings and recommendations for a follow-up chest radiograph contained in Dr. Charletta's report were not effectively communicated to either Dr. Troy or Pauline's primary physician and prevented Pauline from receiving timely and necessary treatment.

¶ 46    In his affidavit, expert radiologist Dr. Stephen Gerzof (hereinafter Dr. Gerzof) opined that Dr. Charletta breached the requisite standard of care by failing to properly communicate his interpretation of Pauline's MRI to Dr. Troy, and that this breach resulted in Pauline's death. Dr. Gerzof explained that pursuant to the guidelines published by the American College of Radiology (hereinafter ACR) certain radiographic findings require a "non-routine communication from a radiologist to a referring physician." Nonroutine communications include contact by telephone or in person to the treating physician to assure receipt of the findings. According to Dr. Gerzof, nonroutine communications are to be handled in a manner most likely to reach the attention of the treating or referring physician in time to provide the most benefit to the patient. Situations that require a nonroutine communication include, *inter alia*, findings that: (1) suggest a need for immediate or urgent intervention; or (2) that the interpreting physician reasonably believes may be seriously adverse to the patient's health and are unexpected by the treating or referring physician.

¶ 47    Dr. Gerzof opined that Dr. Charletta failed to personally communicate the following to Dr. Troy: (1) Dr. Charletta's unexpected pulmonary findings in Pauline's right lung, which at that time constituted "conditions that might have been seriously adverse to [her] health and that if not acted upon, might have worsened over time and possibly resulted in an adverse patient outcome," and (2) Dr. Charletta's recommendation that Pauline undergo two follow-up chest X-rays to be compared with the original X-ray so as to confirm the presence of the abnormal lung mass. According to Dr. Gerzof, in violation of the applicable standard of care, instead of personally communicating his findings and recommendations to Dr. Troy, Dr. Charletta merely transmitted his MRI report to his computer server in the basement of Midwest. According to Dr. Gerzof, Dr. Charletta also failed to obtain any confirmation that Dr. Troy or anyone else at Midwest read or appreciated the significance of his report, or communicated the findings in that report to Pauline. Instead, according to Dr. Gerzof, Dr.

Charletta "assumed" that Dr. Troy would obtain, read, appreciate and appropriately communicate his findings and recommendations to the patient.

¶ 48    Dr. Gerzof further averred that Dr. Charletta violated the applicable standard of care when in the caption section of his MRI report, next to the rubric, "normal" he wrote "yes," since that notation was misleading

¶ 49    Dr. Gerzof finally opined that Dr. Charletta's failure to communicate or establish policies or procedures to assure receipt of his MRI reports, resulted in a one-year delay in Pauline's diagnosis and treatment. This delay guaranteed the unchecked progress of her cancer and significantly reduced her chance of survival, ultimately resulting in her untimely death.

¶ 50    In her affidavit, expert radiologist Dr. Carol Westbrook (hereinafter Dr. Westbrook) concurred with Dr. Gerzof's findings and opined that the approximate one-year delay in the diagnosis and treatment of Pauline's cancer was the result of Dr. Charletta's negligent failure to follow standard procedures in notifying Dr. Troy of the incidental radiographic finding that had serious implications for Pauline's health. According to Dr. Westbrook, Dr. Charletta could not assume and should not have assumed that Dr. Troy read the report in its entirety or appreciated the significance of Dr. Charletta's findings. In a situation such as this one, Dr. Westbrook opined, "where an incidental X-ray finding has such serious consequences for a patient, it is standard practice for the radiologist to notify the ordering physician by phone or fax to make certain he is aware of the result and can arrange appropriate follow-up." According to Dr. Westbrook, since Dr. Charletta did not take the initiative to notify Dr. Troy, the opportunity for early diagnosis of cancer was missed and Pauline suffered irreparable harm by the delay, which allowed her cancer to progress from potentially curable, early stage cancer to an advanced, metastatic disease with little chance of survival.

¶ 51                                    C. Summary Judgment

¶ 52    After the close of discovery, on August 24, 2010, the defendants moved for summary judgment on the issue of proximate cause. Primarily relying on Dr. Troy's testimony that he received Dr. Charletta's report, noted the abnormal findings in Pauline's right lung, and appreciated its clinical significance, the defendants argued that the alleged breach of the standard of care by Dr. Charletta in communicating his findings to Dr. Troy had not made any difference to Dr. Troy's understanding or actions and therefore was not the proximate cause of Pauline's death. In support of their motion to dismiss, the defendants attached, *inter alia*, a copy of the complaint, as well as transcripts from the evidentiary depositions of Dr. Charletta, Dr. Troy, Hesse, Schrader, and Dr. Markovitz.

¶ 53    In response, the plaintiff argued that there remained a question of fact regarding whether Dr. Troy actually read Dr. Charletta's report. The plaintiff pointed out numerous discrepancies and contradictions in Dr. Troy's testimony, including: (1) that contrary to Dr. Troy, Pauline testified that he never told her about the report; and (2) that none of Pauline's medical records from Midwest from October 11, 2006 to August 1, 2007 reference the receipt of that report, or Dr. Troy informing Pauline of the contents of that report. In support, the plaintiff attached the affidavits of his three experts (Schorr, Dr. Gezof, and Dr. Westbrook) and the transcripts of several depositions taken during discovery, including, *inter*

*alia*, those of Pauline, Dr. Troy, Bordick, Dr. Charletta, Hesse, and Dr. Markovitz.

¶ 54    After hearing arguments on the defendants' motion to dismiss, on February 23, 2012, the circuit court initially denied the motion. The defendants then moved for reconsideration, and the circuit court granted their request, entering summary judgment in their favor. The plaintiff appeals, contending that it was error to grant summary judgment because fact questions remained as to whether the defendants' actions proximately caused Pauline's death. For the reasons that follow, we reverse and remand.

¶ 55                                    II. ANALYSIS

¶ 56    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Summary judgment is proper when " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 28 (quoting 735 ILCS 5/2-1005(c) (West 2008)); see also *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 399 (2010). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material in the record strictly against the moving party. *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010) (citing *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 670 (1992)). "A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts." *Morrissey*, 404 Ill. App. 3d at 724 (citing *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510 (1993), and *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995)). We review the circuit court's decision to grant or deny a motion for summary judgment *de novo*. *Palm*, 2013 IL 110505, ¶ 28; see also *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007).

¶ 57    To sustain an action for medical malpractice, a plaintiff must prove: (1) the proper standard of care in the medical community by which the physician's treatment should be measured; (2) that the physician negligently breached or deviated from that standard of care; and (3) that the resulting injury to the patient was proximately caused by the physician's deviation from that standard of care. *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 843 (2010) (citing *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986)); see also *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 102 (2000).

¶ 58    Proximate cause is ordinarily a fact question to be decided by a jury, but if there is no material issue of fact or only one conclusion is clearly evident, it may be decided as a matter of law. *Sunderman v. Agarwal*, 322 Ill. App. 3d 900, 903 (2001) (citing *Williams v. University of Chicago Hospitals*, 179 Ill. 2d 80, 88 (1997)); see also *Johnson*, 402 Ill. App. 3d at 843 ("Although the issue of proximate cause is generally a question of fact, at the

-12-

summary judgment stage the plaintiff must present some affirmative evidence that is 'more probably true than not true' that the defendant's negligence was a proximate cause of the plaintiff's injuries. [Citations.]"); see also *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 19 (1999).

¶ 59    "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006) (citing *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000)); see also *Johnson*, 402 Ill. App. 3d at 843. It is the plaintiff's burden to present expert testimony that shows both that: (1) the defendant "deviated from the standard of care" and (2) "that *that deviation* was the proximate cause of the plaintiff's injury." (Emphasis in original.) *Snelson v. Kamm*, 204 Ill. 2d 1, 46 (2003). "The rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony." *Snelson*, 204 Ill. 2d at 42.

¶ 60    In the present case, the plaintiff argues that the trial court erred in granting summary judgment in favor of Dr. Charletta and DAC, because there remains a genuine issue of material fact as to whether Dr. Charletta's failure to make a "real-time" communication of his unexpected MRI findings to Dr. Troy (*i.e.*, by fax or by telephone) to ensure his receipt of those findings proximately caused Pauline's death. The plaintiff points to numerous contradictions in the medical records obtained from Midwest, as well as the depositions of Dr. Troy and Hesse, to argue that there remains a fact question as to whether Dr. Troy actually received and read Dr. Charletta's report. The plaintiff contends that the trial court improperly weighed the evidence and made credibility determinations when it chose to believe Dr. Troy's and Hesse's testimony that Dr. Troy read and understood that report. The plaintiff points out that contrary to Dr. Troy's testimony that he generally "never review[s] [reports] outside of sitting down with [his] patients," and that he read and reviewed Dr. Charletta's report with Pauline in the exam room on October 11, 2006, Pauline testified that she was never told about the report. The plaintiff also points out that while Dr. Troy only testified to reviewing the report with Pauline in the exam room, nurse Hesse stated that she observed him reading the report in the hallway before entering the room. In addition, the plaintiff argues that none of Pauline's medical records from Midwest "reference Dr. Charletta's report or state that Dr. Troy communicated the findings in that report to Pauline," and that "none of Pauline's medical records from Midwest reference Dr. Troy receiving and/or reading the report." Finally, the plaintiff avers that Dr. Troy testified that with "99.9% of his patients," but not with Pauline, who was medically trained, he would have documented the conversation in which he reported the results of the MRI to the patient.

¶ 61    The defendants, on the other hand, assert that the "uncontroverted" deposition testimony of Dr. Troy and Hesse establishes that Dr. Troy read, understood and considered Dr. Charletta's report to be clinically significant. More importantly, the defendants point out that Dr. Troy testified that he would not have "done anything differently" had Dr. Charletta made a "real-time" communication of that report to him. The defendants contend that this uncontradicted testimony establishes that nothing that Dr. Charletta did would have

-13-

influenced Dr. Troy's behavior, and therefore the link in the proximate cause chain between Dr. Charletta's actions and Pauline's injuries was broken, so as to bar any claim of negligence against him. For the reasons that follow, we agree with the plaintiff.

¶ 62    We begin by addressing cases cited by the defendants holding that where proximate cause is contingent on the actions of an intervening third party, as a matter of law, a plaintiff cannot prevail on his medical malpractice claim if there is no evidence that the third party would have done anything differently. See, *e.g.*, *Gill v. Foster*, 157 Ill. 2d 304, 307-08 (1993); *Snelson*, 204 Ill. 2d at 45; *Seef*, 311 Ill. App. 3d at 26-27; *Sunderman*, 322 Ill. App. 3d at 903; *Johnson*, 402 Ill. App. 3d at 843.

¶ 63    In *Gill*, the plaintiff suffered an injury when a nasal gastric tube punctured his stomach during a surgery, which ultimately resulted in the patient having to undergo an additional surgery to correct the problem. *Gill*, 157 Ill. 2d at 307-08. Prior to being discharged from the hospital after the initial surgery, the plaintiff was examined by a nurse and complained to her of chest pains. *Gill*, 157 Ill. 2d at 309. Rather than informing the treating physician of this complaint, the nurse advised the plaintiff to see his family doctor. *Gill*, 157 Ill. 2d at 309. In his complaint, the plaintiff alleged, *inter alia*, that the discharge nurse was negligent in failing to relate his symptoms to the nursing supervisor or the plaintiff's treating physician. *Gill*, 157 Ill. 2d at 309. The complaint further alleged that this contributed to a delay in diagnosing the plaintiff's injury, which in turn led to a more complicated surgery to fix the problem. *Gill*, 157 Ill. 2d at 310.

¶ 64    The trial court granted the defendant hospital's motion for summary judgment as to the negligence of the discharge nurse, concluding that the plaintiff had failed to establish proximate cause between the nurse's failure to inform the treating physician of the plaintiff's complaints and the plaintiff's injury. *Gill*, 157 Ill. 2d at 310.

¶ 65    On appeal, our supreme court affirmed. *Gill*, 157 Ill. 2d at 310. In doing so, the supreme court noted that the patient had been complaining of chest pains for three days prior to his release from the hospital. *Gill*, 157 Ill. 2d at 310-11. During those three days, his treating physician examined him several times (including once on the morning of the discharge) and was aware that the plaintiff was experiencing chest pains. *Gill*, 157 Ill. 2d at 310-11. Our supreme court held that because the physician failed to diagnose the plaintiff's condition despite knowing about the chest pains, the nurse's failure to inform him that the plaintiff had complained to her that he was still experiencing chest pains could not have been a proximate cause of the physician's failure to diagnose the problem. *Gill*, 157 Ill. 2d at 311. As the supreme court stated: "even assuming the nurse had breached a duty to inform the treating physician of the patient's complaint, this breach did not proximately cause the delay in the correct diagnosis of the plaintiff's condition." *Gill*, 157 Ill. 2d at 311.

¶ 66    In *Snelson*, likewise, our supreme court held that a plaintiff did not establish that the nurses' failure to inform his treating physician about his pain was the proximate cause of his injury, since the physician himself testified that he was aware of the pain. *Snelson*, 204 Ill. 2d at 44-50. In that case, the plaintiff had undergone a procedure called a translumbar arteriogram. *Snelson*, 204 Ill. 2d at 10. Because of a complication in the procedure, however, he experienced a blood clot, which ultimately caused much of the tissue in his large and

small intestines to die due to lack of blood flow to the intestines. *Snelson*, 204 Ill. 2d at 14-15. Although the plaintiff complained of abdominal pain immediately after the procedure and continued to complain of it throughout the night, his treating physician did not diagnose the problem until the following day. *Snelson*, 204 Ill. 2d at 11-15. At trial, the plaintiff's expert witness testified that the delay in diagnosis was the proximate cause of the loss of so much intestinal tissue. *Snelson*, 204 Ill. 2d at 15-16.

¶ 67    While the plaintiff was recovering, throughout the night, nurses charted his vital signs and complaints of abdominal pain, and generally kept his treating physician informed of the plaintiff's condition. *Snelson*, 204 Ill. 2d at 11-12. However, the nurses failed to tell the physician: (1) that they had placed a catheter in the patient at 3 p.m. and (2) that the plaintiff continued to complain of abdominal pain after the physician left for the day at 6 p.m. The plaintiff alleged that these omissions constituted a breach of the standard of care applicable to the nurses. *Snelson*, 204 Ill. 2d at 42-43.

¶ 68    The trial court granted a judgment notwithstanding the verdict in favor of the nurses and our supreme court affirmed. *Snelson*, 204 Ill. 2d at 23. In doing so, the supreme court noted that the physician had testified that he had access to the nurses' notes on their care of the patient and that therefore he must have been aware when he examined the patient in the evening that the catheter had been placed at 3 p.m. *Snelson*, 204 Ill. 2d at 43. The physician also testified that the nurses had provided him with all the information that he needed. *Snelson*, 204 Ill. 2d at 15. Our supreme court also noted that "there was no indication *** that [the physician] would have taken a different course of action had he been informed that [the patient] had some pain after [he] left at 6 p.m." *Snelson*, 204 Ill. 2d at 45. As our supreme court explained, the physician must have been aware that the plaintiff was experiencing pain and "clearly anticipated" that the plaintiff's pain would continue throughout the night because he increased the dosage of the pain medication the patient was receiving. *Snelson*, 204 Ill. 2d at 44. Based on the aforementioned facts, the court recognized that since the physician already knew that the patient was in pain, there was no causal connection between the hospital nurses' failure to provide the physician with that information and the physician's late diagnosis:

"That [the physician] knew about [the patient's] pain and yet was unconcerned about it beyond his ordering of [pain medication] means that the nurses' conduct on this matter could not have been the proximate cause of [the patient's] injury even if there had been testimony that they deviated from the standard of care in failing to advise of pain." *Snelson*, 204 Ill. 2d at 44.

¶ 69    Our careful review of *Gill* and *Snelson* reveals that neither involved a factual dispute surrounding what the involved medical professional might have done if in possession of certain information. While the defendants here would appear to suggest that a plaintiff could never overcome the "I would not have done anything differently" testimony in a malpractice case, they forget that different fact patterns might allow for the presence of a factual dispute. See *Snelson*, 204 Ill. 2d at 45-46. In fact, in *Snelson*, our supreme court explicitly addressed and rejected this same argument. *Snelson*, 204 Ill. 2d at 45-46. In that case, the plaintiff failed to present expert testimony regarding whether the nurses' deviation from the standard of care proximately resulted in the patient's injury, feeling that it was precluded by the court's

holding in *Gill. Snelson*, 204 Ill. 2d at 44-45. The plaintiff argued that *Gill* makes it impossible for a plaintiff to prove causation any time a physician testifies that "he would not have acted differently" regardless of what information he was provided with by the nurses. *Snelson*, 204 Ill. 2d at 45. Our supreme court disagreed and called this argument a "red herring" because it assumes that doctors would not be willing to tell the truth about whether the conduct of others affected their decision making ability and because "a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decisionmaking." *Snelson*, 204 Ill. 2d at 45-46.

¶ 70        It appears that the plaintiff in the case *sub judice* has taken the litigation advice offered by our supreme court. In addition to Pauline's testimony that Dr. Troy never informed her of the test results, the plaintiff offered expert witness testimony of what reasonably well-qualified physicians would have done if in the position of Dr. Troy and Dr. Charletta. Specifically, Dr. Gerzof and Dr. Westbrook concurred that Dr. Charletta's failure to communicate the results of his MRI report directly to Dr. Troy so as to assure his receipt and understanding of the incidental findings in that report, which had serious implications for Pauline's health, both violated the applicable medical standard of care and resulted in the one-year delay in Pauline's diagnosis and treatment.

¶ 71        The fundamental flaw in the defendants' position in this case is that it was improper for the trial court to effectively give dispositive effect to Dr. Troy's testimony that he would not have done anything differently because the plaintiff supplied the trial court with specific evidence that Dr. Troy did, in fact, do something different than he claimed to have done. Pauline testified that Dr. Troy *never* told her about the X-ray finding. Her testimony in this regard is consistent with the fact that she never followed up with this potentially life-threatening diagnosis. She testified that as an oncological nurse, she equated the term "mass" with the very possibility of death and that she would have taken steps to make sure that she was properly diagnosed and treated. Furthermore, the very manner and method under which she was ultimately diagnosed is entirely consistent with the plaintiff's experts' theories on why the defendant was negligent. As mentioned above, about one year after her interaction with Dr. Troy in which he claimed to have told her of the possible cancer diagnosis, Pauline was seen by another physician, Dr. Markovitz, about neck pain. He ordered a radiological study, which revealed the same lesion as the earlier study. At that time, however, that radiologist immediately informed Dr. Markovitz of the diagnosis and proper treatment was immediately undertaken. A jury should have been allowed to consider the expert evidence and the factual evidence alluded to above to make a determination of whether a reasonably well-qualified physician in Dr. Charletta's position would have directly informed Dr. Troy of this incidental yet clinically significant finding. Furthermore, a jury should have been allowed to determine whether Pauline was telling the truth or whether Dr. Troy and Hesse were telling the truth. There are compelling arguments to be made by either side as to why it is more likely that one or the other is telling the truth. The trial court clearly gave credit to the defendants' version of events and discounted the plaintiff's. This is the sort of dispute that is left for a jury.

¶ 72    Moreover, unlike the factual scenarios in *Gill* and *Snelson*, the plaintiff here presented ample evidence that would allow a jury to find that Dr. Troy failed to inform Pauline of the radiological findings because he failed to note the electronic version of Dr. Charletta's report in his medical records. Contrary to the defendants' position, those records failed to unequivocally establish that Dr. Troy actually read the report and conveyed its findings to his patient. Although the records contain Dr. Charletta's report, with Dr. Troy's initials, the initials are dated November 2006, a month after Dr. Troy testified he spoke to Pauline about Dr. Charletta's report. What is more, Dr. Troy himself admitted that he initials MRI reports when he reads them and that he ordinarily "never review[s] them outside of sitting down with [his] patients." In addition, the plaintiff offered an affidavit of a medical record-keeping expert, Schorr, who opined that the fact that Dr. Troy's medical records contain no mention of Dr. Troy telling Pauline about Dr. Charletta's report, "confirm[s]" that the pulmonary findings and recommendations in that report were not effectively communicated to Dr. Troy.

¶ 73    In terms of proximate causation, this type of evidence could have permitted a jury to conclude that there was a communication failure that allowed the information in Dr. Charletta's report to fall between the cracks, to the detriment of the patient, who was ultimately deprived of a full year of oncological treatment for her lung cancer. Hesse's and Dr. Troy's testimony that Dr. Troy received and read Dr. Charletta's report and that he so informed Pauline does not in any way vitiate the plaintiff's theory of causation; it merely confirms a controversy. Under this record and our supreme court precedent, we are compelled to conclude that the trial court improperly granted summary judgment on this important jury question. *Cf. Suttle*, 315 Ill. App. 3d at 103-05 (reversing a judgment notwithstanding the verdict in favor of the defendant hospital; holding that the question of whether the physician's treatment of the plaintiff would have been the same if he had been accurately informed of the plaintiff's true condition was a question of fact for the jury).

¶ 74                                    III. CONCLUSION

¶ 75    For all of the above reasons, we find that the circuit court improperly granted summary judgment in favor of the defendants. Accordingly, we reverse the judgment of the circuit court and remand for further proceedings.

¶ 76    Reversed and remanded.